616 So.2d 899 (1993)
Debbie Denise PORTER
v.
STATE of Mississippi.
No. 90-KA-949.
Supreme Court of Mississippi.
April 1, 1993.
*901 Charles D. Easley, Jr., Columbus, for appellant.
Michael C. Moore, Atty. Gen., Pat S. Flynn, Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, C.J., and SULLIVAN and McRAE, JJ.
SULLIVAN, Justice, for the Court:
Debbie Denise Porter was indicted by the Lowndes County grand jury in its 1990 vacation term with "unlawfully, wilfully & feloniously, purposely and knowingly causing bodily injury to her unnamed infant child by a means likely to produce death or serious bodily injury, to-wit: by placing the child inside a garbage sack and depositing her outside in the elements; causing bodily injury to said infant... ." Porter was convicted on aggravated assault charges and was sentenced to ten (10) years in the custody of the Mississippi Department of Corrections. Porter appeals to this Court and assigns the following errors:
1. Whether the trial court erred in failing to grant Defendant's motion for a change of venue;
2. Whether the trial court erred in failing to grant Defendant's challenges for cause for all members of the venire who had knowledge of the case;
3. Whether the trial court erred in failing to sustain Defendant's Batson challenge;
4. Whether the trial court erred in failing to grant Defendant's motion to quash the panel because of the circuit clerk's improper remarks to the venire before voir dire;
5. Whether the trial court erred in failing to grant Defendant's motion to suppress un-Mirandized statements made by Defendant to police;
6. Whether the trial court erred in failing to grant Defendant's motion for a directed verdict;
7. Whether the trial court erred in failing to grant Defendant's requested lesser included offense jury instruction; and
8. Whether the trial court erred in failing to grant Defendant a circumstantial evidence instruction.
During the voir dire of this case the Circuit Judge inquired whether any members of the venire had seen or heard about this case through the media, and nineteen (19) responded in the affirmative. After *902 further questioning, eighteen (18) venire members stated unequivocally that media reports had not caused them to prejudge Porter and that they could base their verdict solely on the evidence presented at trial and the instructions received from the judge. Joyce Linton, the remaining member of the venire, did not answer whether she could base her verdict solely on the evidence presented at trial and the instructions given by the judge. She went on to express some personal opinions which she felt should disqualify her from service. Ms. Linton was subsequently removed for cause.
When questioned by counsel for Porter, thirteen (13) of the nineteen (19) venire members said they were upset by the reports they had seen. Of the six other venire members who previously admitted hearing about the case through the media, one (1) did not respond, one (1) said he was "not really" upset, two (2) were "shocked", one (1) said the reports "bothered" him, and one (1) said she was now indifferent as the reports had been a while back. Two (2) members of the venire who had not previously stated they heard or saw media reports of the case now admitted that they had and were indeed upset by these reports. Another two (2) veniremen said they were upset upon hearing about the case from friends. These four (4) veniremen had also indicated that they presumed Porter innocent, that they would base their verdict solely on evidence presented at trial, and they would follow instructions of law given by the judge.
Before any challenges were made, Porter moved for a change of venue because of the number of veniremen who said they were upset about the case after learning of it via the media. Porter argued that if they were upset by the facts they had already formed an opinion on the case. In the alternative, Porter requested the panel be quashed because of the number of veniremen upset by the facts and because of the opinions of Ms. Linton, which had been voiced before the whole panel. Porter also contended that the panel had been prejudiced by a remark made by the clerk that the veniremen could be excused for age if over sixty-five (65), but that their help was needed. This motion was overruled.
Porter then unsuccessfully moved to strike for cause twenty (20) members of the panel who said they were bothered, shocked, or upset by reports of the case from friends or media, including one potential juror who stated she was now indifferent. In overruling these challenges for cause the judge noted that these venire members had indicated that they would base their verdict solely on the evidence produced at trial and the instructions given by the court.
Of the twenty (20) potential jurors Porter had attempted to strike for cause because they were upset by the facts of the case, two (2) were successfully challenged for cause with different reasons provided by Porter. Following the peremptory challenges, the "upset" group of veniremen had been reduced to thirteen (13); two (2) were stricken by the State and three (3) by Porter.
In the midst of these peremptory challenges, Porter lodged a Batson objection. Of the prosecutor's six (6) peremptory challenges, four (4) were to members of the Black race. The racially neutral reasons given for striking these potential jurors were: two (2) veniremen, apparently of an age to be employed, had no occupation; one (1) venire member knew Porter's family and several of her witnesses; the one (1) remaining target of the prosecutor's peremptory challenges, to which Porter objected, knew Porter. Porter argued that the State had accepted three White veniremen who were unemployed. (Two were homemakers and the third was retired.) The State responded that the retired venireman was of retirement age and that homemaking was a valid occupation. The Batson motion was overruled.
The jury finally accepted consisted of five (5) members of the "upset" group, one (1) of whom was Black while the other four (4) were White, one (1) additional Black juror, and six (6) other White jurors. The alternate was also White.
*903 The first witness for the prosecution was Bennie Billups, the paramour of Porter's next-door neighbor, Lisa Richardson. Billups was at Richardson's house the evening of November 8, 1989, until the early morning of November 9, 1989. While inside Richardson's house, with all doors and windows closed, Billups heard a sound like a cat or a baby but did not investigate. When preparing to leave Richardson's home via the back door, Billups still heard the crying sound and saw a Black female in Porter's back yard. She was bending over a garbage bag but Billups could not tell what she was doing with it. To avoid detection Billups went back into the house and left through the front door. He testified that he continued to hear the crying noise when he was a block away from the Porter/Richardson duplex. On cross-examination Billups was adamant about having heard the crying before and after leaving Richardson's home, although in a statement given to police the day after the incident he had only mentioned hearing the crying sound upon leaving the house.
Lisa Richardson corroborated Billups' testimony as she too said they heard the sound of a baby crying while inside her house before Billups left. Richardson also testified that the crying was continuous for some period of time after Billups left and was loud enough to keep her awake for a while. At seven o' clock the following morning, Richardson went outside to hang some clothes and still heard the crying, but at this point it had gotten much weaker. She saw only a garbage bag in Porter's back yard and assumed the crying was coming from the bag. Richardson went to the Porter house and told Mattie Porter, mother of the appellant, that she had heard a baby crying all night and that she thought there was a baby in the garbage bag in her (Mattie's) back yard. Richardson testified that on the way to speak to Mattie she saw blood on the Porters' back porch. Mattie Porter got a broom with which she probed the garbage bag, then she and Richardson decided to call 911 and let the police handle the matter.
Shell Richardson, who lived across the street from the Porters, testified that she was visiting at the Porter house when Lisa Richardson came to tell Mattie about the baby. When Mattie Porter left her back yard to call 911, the baby stopped crying so Shell tore open the garbage bag, and in the process a plastic Kroger bag which had been placed over the baby's head, "so the baby [could] get some air." Shell reported that she had seen Debbie Porter go in and out of the living room of the Porter house over the course of the morning.
Officer Carroll Culpepper, of the Columbus Police Department, testified that he had responded to the call about an abandoned baby on the morning of November 9, 1989. He found a newborn baby girl inside a garbage bag which had been torn open. The child was crying very lightly, her breathing was very weak, and her skin was cold and clammy with a considerable amount of dried afterbirth fluid on it. Officer Taylor, another policeman on the scene, decided they should not wait for an ambulance but should transport the baby to the hospital themselves. Once inside the patrol car the baby stopped breathing and Culpepper commenced rescue breathing. When the infant did not respond he checked for an airway obstruction. Finding none, he performed rescue breathing a second time and the baby responded with one breath but then stopped breathing again. Culpepper checked for vital signs, found none, and started CPR. After approximately two minutes the baby responded and was breathing on her own when they reached the hospital.
Billy Speed, an investigator with the Columbus Police Department, also testified that during the course of his investigation of this case on the morning of November 9, 1989, he saw blood around the back door of the Porter house and asked Mattie Porter if he could look around her kitchen area. Mattie allowed him inside and Speed found more blood on the kitchen floor, on the wall, and on the pantry curtain. He then obtained permission from Mattie Porter to search the rest of the house. He found spots in the hall and the bathroom that appeared to have been freshly mopped and found a bottle of Pine Sol and a wooden *904 bowl by the bed in one of the bedrooms. Debbie Porter was in this bedroom when Speed examined it and it was later discovered that this was her bedroom. When Speed remarked that everything was wet she told him she had been cleaning. Speed then pulled the spread back from the bed and found blood on the sheets. When Speed approached a plastic bag that appeared to contain dirty clothes, Debbie intervened, picked up a sweat shirt, and told him the bag had nothing in it but dirty clothes. The sweat shirt had blood on it and Speed saw that other items in the bag also had blood stains. Speed told Corporal Ed Williams about what he had seen.
Speed testified that after he spoke to Williams, he asked Mattie Porter to sign a waiver of search warrant form and he then confiscated the bag of dirty clothes as evidence. At the police department Speed removed the clothes from the bag and found a white plastic sack which contained the afterbirth. Photos of the clothes and the bag containing the afterbirth were admitted into evidence.
Corporal Ed Williams of the Columbus Police Department also testified for the prosecution and corroborated Speed's testimony regarding the blood found within the house. The jury was removed from the courtroom and Porter moved to suppress the statement she made to Williams claiming it was obtained through trickery and coercion. Although the judge stated that the rules require suppression motions to be heard in advance of trial, he allowed Porter to pursue her motion outside the presence of the jury. Williams testified that after seeing the blood and the bloody clothes in the bedroom, he decided to talk to the Porters to learn what they knew about the baby. He told the Porters that the person who had delivered the baby had lost a lot of blood and could die without receiving medical treatment. At this point, Debbie Porter indicated she wanted to talk to him but with only her mother present. When the various friends and neighbors who had gathered at the Porter house were out of the way, Debbie Porter told Williams she had delivered the baby, panicked, put the baby in the bag, and took it outside. Williams then told her not to talk any more as she needed to get some medical help. This was corroborated by Larry Taylor, another officer who was on the scene on the morning of November 9, 1989. Both Williams and Taylor testified that Debbie Porter was not a suspect at the time she informed them that she was the mother of the child. It was stipulated between Porter and the prosecution that Williams had not advised Porter of her rights before she admitted being the baby's mother. Porter claimed she told Williams that she admitted being the infant's mother because Williams' talk of medical complications and possible death had scared her. She also admitted that she was not being addressed or questioned as though she were the mother of the child, but that Williams was talking generally to everyone in the house in order to learn who the mother was. Porter's motion was overruled and the trial judge stated that Williams had interviewed Porter as any other witness and that no Miranda warnings are required during general on-the-scene investigations. The jury was returned to the courtroom and Williams was allowed to testify about the statement Debbie had made.
Dr. Skiwski, the pediatrician who had treated the infant upon her arrival at the hospital, testified for the prosecution. An expert in pediatrics, he testified that the abandoned infant was approximately thirty-six (36) or thirty-seven (37) weeks gestation and weighed just over four (4) pounds. The baby's lungs were congested and her heart rate was close to failing. His opinion was that at the time the baby was brought to the hospital she would have survived less than another hour without medical treatment. The child was diagnosed as suffering from severe hypothermia from exposure, cardiopulmonary arrest, hypotension, hypoglycemia, hypocalcemia, and aspiration pneumonia. While rescue measures were being administered at the hospital the baby twice died for close to two minutes each time. The infant lived but suffers from spastic cerebral palsy, which is the inability of the brain to precisely control muscle contractions. In Skiwski's opinion *905 the spastic CP is a serious bodily injury and was caused by the cold stress from exposure.
On cross-examination, Dr. Skiwski stated that a full term baby is one born anywhere from thirty-seven to forty-two weeks gestation, which would make the infant victim at most one week premature. He admitted that some prenatal problems can cause cerebral palsy, but none were specifically named and none were alleged to have been suffered by Debbie Porter. Dr. Skiwski recalled that the baby was discharged into the care of the welfare department.
After the testimony of the doctor, the prosecution rested and Porter moved for a directed verdict. When her motion was overruled, Porter herself took the stand and said that she was not aware she was in labor in the early morning hours of November 9, 1989. She got out of bed to get a drink of water, got dizzy, opened the back door to get some cool air, and was hit by a sharp pain as the baby exited her body. Porter said the baby did not cry or move so she thought it was dead. She panicked and put the baby in a bag and placed it outside. Once back in her room she felt dizzy, got in bed, and remembered nothing until later that morning when she awoke to find police officers in the house. Porter had not seen a doctor about her pregnancy until a week before the baby was born. She had not told her mother she was pregnant because she was scared and didn't know how her mother might react. Since the birth, Porter had seen the baby two or three times a month and named the child. She claimed to love the child and said she intended her no harm. On cross-examination, it was elicited from Porter that she intended to put her baby in the garbage bag and intended to carry the bag outside, although she still claimed she thought the child was dead. She also admitted that she was aware that leaving a live child outside overnight in cold weather could be fatal to the child. Porter said that she did put the baby in a garbage bag but claimed to know nothing about the plastic Kroger bag found over the infant's head.
Once again Porter moved for a directed verdict and once again it was denied. After closing arguments and jury deliberations a guilty verdict was returned, and Porter was subsequently sentenced to serve ten (10) years in custody of the Mississippi Department of Corrections.

I.

DID THE TRIAL COURT ERR IN FAILING TO SUSTAIN DEFENDANT'S MOTION FOR A CHANGE OF VENUE?
"It is fundamental and essential to our form of government that all persons charged with a crime have the right to a fair trial by an impartial jury." White v. State, 495 So.2d 1346, 1348 (Miss. 1986). When it is alleged that an impartial jury can not be obtained without a change of venue, the decision to deny such a motion is within the sound discretion of the trial court. Harris v. State, 537 So.2d 1325, 1328 (Miss. 1989). Where this discretion has not been abused the decision of the trial court will not be disturbed. Shook v. State, 552 So.2d 841, 849 (Miss. 1989).
The presumption that an impartial jury can not be obtained may at times be irrebuttable. Elements which should serve to indicate an irrebuttable presumption are:
(1) Capital cases based on considerations of a heightened standard of review;
(2) Crowds threatening violence toward the accused;
(3) An inordinate amount of media coverage, particularly in cases of
(a) serious crimes against influential families;
(b) serious crimes against public officials;
(c) serial crimes;
(d) crimes committed by a black defendant upon a white victim;
(e) where there is an inexperienced trial counsel.
White, 495 So.2d at 1349.
Did Porter raise a presumption that an impartial jury could not be obtained? This presumption arises upon proper application for a change of venue. White, 495 So.2d at 1348. Pursuant to Miss. Code Ann. § 99-15-35 (1972), proper application requires a written motion supported by affidavits of two (2) or more *906 witnesses showing that the defendant cannot have a fair and impartial trial in the particular county because of prejudgment of the case or grudge or ill will to the defendant in the public mind. See Lutes v. State, 517 So.2d 541, 545 (Miss. 1987).
Porter's motion for change of venue was made orally during voir dire proceedings and was not supported by affidavits as required by statute. Even if the requirements of Miss. Code Ann. § 99-15-35 (1972) are merely "mechanical," as Porter argues, it benefits her not at all. Each of the twenty-one (21) venire members who had heard of the case and were upset, shocked, or bothered by what they heard also stated under oath that they would base their verdict solely on evidence presented at trial and either that media reports had not caused them to prejudge the guilt or innocence of Porter or that they presumed Porter innocent. The record does not reveal prejudgment of the case or ill will toward the defendant in the public mind.
Based on the questions and responses during voir dire, it appears that an impartial jury was actually impaneled. Although all venire members who had heard of the case prior to voir dire stated they had not prejudged the case and would render a verdict based solely on the evidence presented at trial and the instructions of law given by the trial judge, only five (5) of this group were actually impaneled on a twelve person jury. Viewing the verdict rendered in light of the evidence presented, it does not seem that the State needed the benefit of a prejudiced jury for Porter's conviction. Indeed, it is hard to imagine a reasonable jury that would not convict on the evidence presented. The same result would have been reached with or without the publicity of which Porter complains. There is no merit to this assignment of error.

II.

DID THE TRIAL COURT ERR IN FAILING TO GRANT PORTER'S CHALLENGES FOR CAUSE FOR ALL MEMBERS OF THE VENIRE WHO HAD KNOWLEDGE OF THE CASE?
Porter asked that twenty (20) venire members be challenged for cause as they had been shocked, upset, or bothered upon learning of the case. The trial judge refused, noting that all had stated they would base a verdict solely on the evidence presented at trial and the instructions of law given by the court. Porter now argues that the potential jurors must have already decided that she was guilty or they would not have been upset upon learning of the case. Although the panel contained other members against whom this challenge could not be made, this does not appear to be a "rational" or "reasonable" challenge requiring the circuit judge to excuse these potential jurors for cause. These venire members had all stated at voir dire either that the reports they heard had not caused them to prejudge the guilt or innocence of Porter or that they currently presumed Porter innocent. These promises of the venire members must be given considerable deference. Scott v. Ball, 595 So.2d 848, 850 (Miss. 1992). Although she argues she could not have removed all of the "upset" venire members via peremptory challenges, she chose not to exhaust her peremptory challenges on these members. The trial judge was not clearly wrong in refusing to excuse these potential jurors for cause, therefore we will not disturb his determination. See Billiot v. State, 454 So.2d 445, 457 (Miss. 1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1232, 84 L.Ed.2d 369 (1985). There is no merit to this assignment of error.

III.

DID THE TRIAL COURT ERR IN FAILING TO SUSTAIN PORTER'S BATSON CHALLENGE?
When a prima facie case of discrimination in the exercise of peremptory challenges has been made, the prosecution must supply racially neutral reasons for using peremptory challenges on minority members. Bush v. State, 585 So.2d 1262, 1268 (Miss. 1991), aff'd, 597 So.2d 656 (Miss. 1992). The defendant may then rebut the reasons offered by the prosecution. Bush, 585 So.2d at 1268, citing Taylor v. State, 524 So.2d 565 (Miss. 1988).
We give great deference to the trial court's findings of fact regarding whether *907 the prosecution articulated neutral, non-race-based explanations for striking jurors. Willie v. State, 585 So.2d 660, 672 (Miss. 1991). If the trial court was within its authority in making this determination, we will not reverse. Id.
Two of the Black veniremen the State struck were challenged for the reason that they were of an age to be employed and had no occupation. Porter argues that the prosecution accepted three White veniremen who were unemployed, two who were homemakers and the third who was retired. The State responded that the retired venireman was of retirement age and that homemaking was a valid occupation.
Porter has satisfied the first two prongs of Batson. Porter is Black and the prosecution exercised peremptory challenges toward the elimination of four members of the Black race. But has Porter shown that the prosecution used peremptory challenges to purposefully exclude veniremen because they were Black?
Any racially discriminatory effect of excluding two Black veniremen because they were acquainted with Porter or with her family was incidental, therefore insufficient to satisfy the third prong of Batson. We are of the opinion that there exists a difference other than race between the two Black unemployed veniremen of employable age and the three Whites. Two of the Whites were employed, as homemaking is an honorable if somewhat tedious profession. The third White venireman was retired and of retirement age.
Though the call is a very close one, we are of the opinion that the State successfully rebutted Porter's Batson challenge.
There is no merit to this assignment of error.

IV.

DID THE TRIAL JUDGE ERR IN FAILING TO GRANT PORTER'S MOTION TO QUASH THE PANEL BECAUSE OF THE CIRCUIT CLERK'S IMPROPER REMARKS TO THE VENIRE BEFORE VOIR DIRE?
Porter argues that the clerk's remark "we may need your help," was designed to "create an affinity with the `State's case'" and cites only Miss. Code Ann. § 13-5-81 (1972). This section allows a challenge to the array for fraud, which is neither alleged nor proved in this case. Nothing in the record supports or strengthens Porter's argument and there is no evidence of fraud or unfairness. This assignment of error is without merit. See Avery v. State, 555 So.2d 1039, 1045 (Miss. 1990).

V.

DID THE TRIAL COURT ERR IN FAILING TO GRANT PORTER'S MOTION TO SUPPRESS HER UN-MIRANDIZED STATEMENTS MADE TO THE POLICE?
Statements made by a suspect while under custodial interrogation are inadmissible at trial where the suspect was not Mirandized, absent a knowing and intelligent waiver of his rights. Tolbert v. State, 511 So.2d 1368, 1374 (Miss. 1987), cert. denied, 484 U.S. 1016, 108 S.Ct. 723, 98 L.Ed.2d 672 (1988). Certain situations are, however, excluded from the scope of Miranda. Id. at 1375. In a non-custodial setting where interrogation is investigatory in nature (general on-the-scene-investigation), Miranda warnings are not required in order that a defendant's statements be admissible. Nathan v. State, 552 So.2d 99, 103 (Miss. 1989). Even in this setting, statements must be freely and voluntarily given in order to be admissible. Nathan, 552 So.2d at 103.
In determining whether a confession is freely and voluntarily given, the circuit judge sits as a fact finder. McCarty v. State, 554 So.2d 909, 911 (Miss. 1989). We will not reverse a fact finder unless he was manifestly wrong. Balfour v. State, 598 So.2d 731, 742 (Miss. 1992).
The applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational *908 choice. U.S. v. Rogers, 906 F.2d 189, 190 (5th Cir.1990). The State has the burden of proving all facts prerequisite to admissibility of the defendant's confession beyond a reasonable doubt. McCarty, 554 So.2d at 911; Davis v. State, 551 So.2d 165, 169 (Miss. 1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 797 (1990).
Porter made the statement at issue in the midst of a general on-the-scene-investigation. She says her statement was obtained through coercion. The prosecution contends that the officers on the scene could not have intended coercion as Porter was not a suspect at the time the statement was made.
Corporal Ed Williams decided to talk to the occupants of the house to learn what they knew about the baby because he "felt that somebody there knew something about the blood being around in that house." Both Williams and Speed testified that Debbie Porter was not a suspect at the time and the record contains several statements to the effect that there was no indication that she had just delivered a child. Porter herself admitted on the stand that she was not the object of the investigatory questions but that Williams was talking generally to everyone in the house in order to learn who the mother was.
Although Porter claimed she only admitted being the baby's mother because Williams' remark scared her, she could have remained silent and sought medical treatment on her own. Instead, she voluntarily made the incriminating statement. No promises or threats were made to induce her statement. Williams' remark that the baby's mother could die without medical treatment was not a threat of police retaliation; instead, it was a reasonable assessment under the circumstances. Porter's statement was clearly obtained in a noncustodial setting where the interrogation was investigatory in nature. It was on this basis that the trial judge allowed Porter's statement to be admitted into evidence and it can not be said that he was manifestly wrong.
Furthermore, Porter subsequently testified on her own behalf and reiterated the information contained in the statement at issue. She alleges in her brief that she would not have testified had it not been for the admission of the statement into evidence. However, she did not attempt to dispute what was said in the statement at issue nor did she claim that Williams intentionally coerced her to make the statement. She merely repeated that she had the baby, panicked, put it in a garbage bag and carried it outside, which is what she said in the statement to Williams. This assignment of error is without merit.

VI.

DID THE TRIAL JUDGE ERR IN FAILING TO GRANT PORTER'S MOTION FOR A DIRECTED VERDICT?
The evidence is uncontroverted that Porter put the child in a garbage bag and placed it outside on a cool November night. She admitted that she intended to put the child in the garbage bag and intended to carry the bag outside, but claimed she thought the baby was dead. Porter also admitted that she was aware that leaving a live child outside overnight in cold weather could be fatal to the child. When an infant is placed inside it, a plastic garbage bag is a "deadly weapon or other means likely to produce death or serious bodily harm." The evidence is also uncontroverted that the baby suffered serious bodily injury as a result of Porter's actions. Porter argues the State failed to prove the requisite intent to sustain an aggravated assault conviction because she believed the child was dead. The prosecution counters that Porter's intent at the time she committed the act is a jury issue. Torrence v. State, 283 So.2d 595, 598 (Miss. 1973).
The crux of Porter's argument is that her mistaken belief that the child was dead affords her a legal excuse to the crime charged. The testimony of Bennie Billups and Lisa Richardson (that they heard a baby crying from next door) belies Porter's claim that the child made no sound. Accepting as true all evidence presented by the State and all reasonable inferences therefrom, Porter knowingly *909 caused bodily injury to her baby daughter with a deadly weapon or other means likely to produce death or serious bodily harm. That is all the statute requires. Nobles v. State, 464 So.2d 1151, 1155 (Miss. 1985). Viewing the evidence in the light most favorable to the State, as we must, there was sufficient evidence to support a guilty verdict. There is no merit to this assignment of error.

VII.

DID THE TRIAL JUDGE ERR IN FAILING TO GRANT PORTER'S REQUESTED LESSER INCLUDED OFFENSE JURY INSTRUCTION?
Mississippi Code Annotated § 97-3-7(1) (Supp. 1992), provides that a person is guilty of simple assault if he:
(a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or (b) negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm... .
Porter's testimony does not bring this case within the statutory definition of simple assault. There was no evidence that the injuries Porter caused the infant to suffer were anything other than serious and Porter could not have been convicted of simple assault pursuant to § 97-3-7(1)(a). Colburn v. State, 431 So.2d 1111, 1114 (Miss. 1983). As Porter admitted that her actions were performed intentionally, she could not have negligently caused bodily injury to the infant pursuant to § 97-3-7(1)(b). The negligence contemplated by the statute does not refer to the subjective intent of the defendant but to the act itself. Nobles v. State, 464 So.2d 1151, 1154 (Miss. 1985). To paraphrase Nobles, whether Porter negligently believed the child was dead is a question for the jury. Either she did or she didn't. Id.
All of the evidence indicates that [Porter put the child in a bag and carried it outside] neither recklessly nor negligently. The [act] was deliberate.... While [Porter] may have been reckless or negligent in jumping to the conclusion that [the infant was dead], [her] testimony reflects that when [s]he [put the child in a garbage bag and carried it outside, this transaction] itself was not an act of negligence or recklessness.
Nobles, 464 So.2d at 1154.
Porter's version does not support an instruction on the lesser included offense of simple assault. There is no error.

VIII.

DID THE TRIAL JUDGE ERR IN FAILING TO GRANT PORTER A CIRCUMSTANTIAL EVIDENCE INSTRUCTION?
"Our law is well-settled that jury instructions are not given unless there is an evidentiary basis in the record for such." Davis v. State, 530 So.2d 694, 701 (Miss. 1988). A trial judge is not required to give an instruction on circumstantial evidence where there is direct evidence of the crime. King v. State, 580 So.2d 1182, 1191 (Miss. 1991).
The record here is replete with direct evidence of the crime. There was no error in failing to grant a circumstantial evidence instruction in this case.
CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TEN (10) YEARS IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED.
HAWKINS, C.J., and PITTMAN, McRAE, ROBERTS and SMITH, JJ., concur.
HAWKINS, C.J., specially concurs with separate written opinion joined by SULLIVAN, JAMES L. ROBERTS, Jr., and SMITH, JJ.
BANKS, J., dissents with separate written opinion joined by DAN M. LEE and PRATHER, P.JJ., not participating.
HAWKINS, Chief Justice, specially concurring:
A lesser included offense by definition is one in which all its essential ingredients are contained in the offense for which the *910 accused is indicted, but not all of the essential ingredients of the indicted offense. An accused could not be guilty of the offense for which he is indicted without at the same time being guilty of the lesser included offense. The lesser included crime is encompassed within the crime for which the accused is indicted. Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985).
There may very well be a separate, distinct and less serious crime which the proof at trial shows the defendant committed, but this does not necessarily mean it is a lesser included offense. To constitute a lesser included offense, every one of the essential ingredients must also constitute essential ingredients of the more serious crime of which the accused is indicted.
If A, B, C and D are the essential ingredients of crime X for which the accused is indicted, and A and B are essential ingredients of crime Y, and A and B were proved, the accused would be entitled to a lesser included offense instruction on crime Y if there were some factual issue on whether C and D had been proved.
Suppose crime Z had ingredients A, B and H, and under the evidence a jury issue is made whether the defendant is guilty of crime X or Z, this does not mean that the defendant is entitled to a lesser included offense instruction. To say that the defendant is entitled to this instruction is to say that such instruction is a correct statement of the law.
It is not. If it were a correct statement of the law, the State would be entitled to the same instruction as the defendant. The State manifestly is not entitled to have the jury instructed it could convict the defendant of an entirely separate, but not lesser included offense.
The defendant is not without ample protection, however. While he might not be entitled to a lesser included offense instruction, he clearly is entitled to have the jury instructed (if it has not in fact been so instructed), that even though the accused under the facts of the case might be guilty of crime Z, the jury under its oath must return a verdict of not guilty unless it believes beyond a reasonable doubt that the accused was guilty of all the essential ingredients of crime X for which he stands charged.
I concur with the majority because in my view Boyd v. State, 557 So.2d 1178, 1181 (Miss. 1989), and Gangl v. State, 539 So.2d 132, 136-37 (Miss. 1989), misapprehended the principle of law concerning the entitlement of a defendant to a lesser included offense instruction, and the Court today is correcting its course. The majority seeks to avoid the mischief such confusion will inevitably generate.
SULLIVAN, JAMES L. ROBERTS, Jr., and SMITH, JJ., join this opinion.
BANKS, Justice, dissenting:
In yet another context we face the issue of failure to grant a lesser included or related offense instruction. It is an issue we face much more often than necessary[1], one which causes reversals and retrials which could otherwise be avoided and, sadly, with deference to this and other majorities, it is one which too often causes affirmances contrary to the rule of law. See, e.g., Boyd v. State, 557 So.2d 1178, 1181-1182 (Miss. 1989); Gangl v. State, 539 So.2d 132, 136-137 (Miss. 1989); Mease v. State, 539 So.2d 1324, 1330-34 (Miss. 1989); Harper v. State, 478 So.2d 1017, 1021-23 (Miss. 1985); Austin v. State, 605 So.2d 14, 15-17 (Miss. 1992) (Banks, J., dissenting on denial of petition to rehear); Toliver v. State, 600 So.2d 186, 189-92, 192-93 (Miss. 1992) (Banks, J., concurring). Because I view evidence that the defendant thought the child in question was already dead as a sufficient evidentiary basis for the simple assault instruction allowing a jury to convict on a finding of physical harm through recklessness, I dissent.
We must first recognize that the seriousness of the injury is not the sole determinant of the degree of assault. Woodward *911 v. State, 164 Miss. 468, 473-75, 144 So. 895, 896 (1932) ("Intent is a necessary element of assault and battery."). The most important factor is intent of the actor. Miss. Code Ann. § 97-3-7 (1972); Toler v. State, 143 Miss. 96, 97-101, 108 So. 443, 444 (1926) ("[I]t is the intent with which an assault is committed that raises it from a misdemeanor to a felony." (emphasis added)). One may cause serious injury through simple negligence without being guilty of assault at all. Woodward, 164 Miss. 468, 473-75, 144 So. 895, 896. Similarly, one may cause serious injury through recklessness, but yet not be guilty of aggravated assault because the degree of recklessness does not rise to a level sufficient to manifest extreme indifference to human life. Miss. Code Ann. § 97-3-7 (Supp. 1992).
To be guilty of aggravated assault through culpable negligence one must recklessly cause serious bodily injury to another "under circumstances manifesting extreme indifference to the value of human life." Miss. Code Ann. § 97-3-7(2) (Supp. 1992). If, however, one "recklessly causes injury to another", but not under circumstances that would manifest an extreme indifference to the value of other people's lives, one is guilty of only simple negligence. Miss. Code Ann. § 97-3-7(1) (Supp. 1992). In Nelson v. State, 361 So.2d 343, 344 (Miss. 1978), this Court held that the phrase "to cause injury recklessly under circumstances manifesting extreme indifference to the value of human life" carries a meaning analogous to the culpable negligence standard applied in manslaughter cases. It was therefore defined as:
[T]he conscious and wanton or reckless disregard of the probabilities of fatal consequences to others as a result of the wilful (sic) creation of an unreasonable risk thereof.
Id. at 344 (quoting Smith v. State, 197 Miss. 802, 817, 20 So.2d 701, 705 (1945).
The majority's reliance on Nobles v. State, 464 So.2d 1151, 1154-55 (Miss. 1985), is, in my view, misplaced. Nobles cut the victim with a knife, claiming he negligently thought he was acting in self-defense. Nobles, therefore, suggested an erroneous belief as an excuse for knowingly doing serious harm. We rejected subjective beliefs as excusing a knowing intent to do the harm, and rightly so. In the instant case, Porter admits to no intentional harm. Her intentional acts would not have caused harm had her belief, that the child was already dead, been correct.
Thus while Porter's subjective belief goes directly to the question of intent to harm, Nobles' belief did not. Put differently, Porter did not believe her actions were harmful, while Nobles knew that his actions would be harmful. His subjective belief as to circumstances warranting self-defense went to a legal excuse for acting in a fashion he knew would be harmful. Here, Porter is no less entitled to a lesser-included instruction than she should be had she caused harm by swinging an object in the mistaken but reckless belief that no one was near enough to be struck. Lott v. State, 83 Miss. 609, 610, 36 So. 11, 11 (1904); see Keeble v. United States, 412 U.S. 205, 212-13, 93 S.Ct. 1993, 1997-98, 36 L.Ed.2d 844, 850 (1973) (where lesser charge contains all of the elements of the greater charge except for specific intent to injure, and defendant's intent is in dispute, lesser-included instruction is warranted); Austin v. State, 605 So.2d 14, 16-17 (Miss. 1992) (Banks, J., dissenting) (same).
The majority's reliance on Colburn v. State, 431 So.2d 1111, 1114 (Miss. 1983) is similarly misplaced as the appellant in Colburn, like the appellant in Nobles; cut his victim and claimed self-defense. The appellant in Colburn did not contend his actions were a product of accident or any mistaken belief which negated the intent to do harm.
Our aggravated assault statute requires wilful, purposeful, or knowing bodily injury or reckless conduct manifesting indifference. Miss. Code Ann. § 97-3-7(2) (1972). Porter testified that she did not knowingly expose a live child to harm. The question whether her recklessness under the circumstances manifested indifference to human life, that is, conscious, willful, and wanton disregard to the probabilities of fatal consequences, was a question for the jury. *912 Without doubt, Porter's testimony "muddied the water" enough to require a lesser-included instruction. Robinson v. State, 571 So.2d 275, 276-77 (Miss. 1990). Indeed, there is nothing in the record of this case indicating a reasonable juror could not have found Porter not guilty of the greater charge and guilty of the lesser-included charge. Ruffin v. State, 444 So.2d 839, 840 (Miss. 1984). In denying her the lesser-included instruction, the jury was given the opportunity to hear Porter's version of the crime, but denied the opportunity to consider that testimony during its deliberations. Boyd v. State, 557 So.2d 1178, 1181 (Miss. 1989). This inconsistency, in my opinion, rises to the level of reversible error.
Because Porter should be granted a new trial, I respectfully dissent.
DAN M. LEE, P.J., joins this dissent.
NOTES
[1] More than three years ago, this Court wrote: "For some unknown reason, our competent and able trial judges continue to refuse instructions on lesser included offenses when the evidence warrants them." Boyd v. State, 557 So.2d 1178, 1181 (Miss. 1989).