PIERCE, Justice,
for the Court.
¶ 1. Carteze[1] Brazzle was indicted by a Hinds County grand jury on one count of carjacking and one count of kidnapping of Camillia Wright, in violation of Mississippi Code Sections 97-3-117 and 97-3-53, respectively. Brazzle was found guilty by a jury on both counts following a trial in the *811 Circuit Court for the Second Judicial District of Hinds County. The trial court sentenced Brazzle to consecutive prison sentences of fifteen years for carjacking and thirty years for kidnapping. Aggrieved by the judgment, Brazzle appeals to this Court. Finding no error, we affirm.
FACTS AND PROCEEDINGS BELOW
¶ 2. Camillia Wright testified that on January 22, 2007, around 11 a.m., she was sitting alone in her red Tahoe in the drive-through line at a Popeye’s restaurant located on Highway 80. While ordering lunch, Wright noticed an individual wearing a black coat standing outside the restaurant “fidgeting on his pants like he was about to take a pee.” The individual, whom Wright later identified as Carteze Brazzle, walked up to her window, pulled out a gun, and ordered Wright out of the vehicle. When she was unable to exit, Brazzle jumped in, forced her over to the passenger side, and drove the vehicle out of the restaurant’s parking lot and onto Highway 80. Wright begged Brazzle to let her go, telling him he could have the Tahoe, but Brazzle refused and threatened to shoot her if she kept looking at him.
¶ 3. The Tahoe proceeded down Highway 80 toward Highway 220. Upon reaching the on-ramp to Highway 220, Brazzle slowed the vehicle. At that point, Wright opened the door and leapt from the Tahoe. A witness who saw her jump pulled over to assist and provided her with a cell phone which Wright used to call the police.
¶ 4. Officer Gregory Jackson, who was on routine patrol, saw Wright standing on the side of the road and pulled his cruiser over to inquire what was going on. Wright informed the officer what had happened.
¶ 5. Moments earlier, Officer Corliss Harris was at a gas station on Highway 80. Officer Harris testified that a motorist drove up and informed him about an incident that had just occurred at Popeye’s. Officer Harris stated that he then drove over to Popeye’s, where “people inside the restaurant were pointing west on 80.” Officer Harris said he then whipped around the parking lot and proceeded down Highway 80. Shortly thereafter, he saw Officer Jackson pulled over on the side of the road at the on ramp to Highway 220, with a black female. Officer Harris said they informed him that the vehicle was a “burgundy SUV,” and indicated that it was traveling west on Highway 80.
¶ 6. While in “very fast” pursuit, Officer Harris received word over the radio that the vehicle had an Illinois license tag. According to Officer Harris, he then spotted the vehicle as it was heading north on Westhaven, off Highway 80. Officer Harris turned off his blue lights and turned his vehicle onto Westhaven. He caught up with the Tahoe, which at that point was stopped at a railroad crossing due to a passing train. As the train proceeded by, Officer Harris received word that his backup was seconds away, so he reactivated his blue lights in hopes of avoiding a “chase.” At that moment, according to Officer Harris, the driver of the vehicle attempted to drive off-road, and in doing so became stuck in a muddy embankment. Officer Harris said the driver then exited the vehicle and ran for a wooded area.
¶ 7. Officer Harris stated that when the other officers arrived they “set up a perimeter and went into the woods after him.” He testified that the individual was soon located and placed under arrest. According to Officer Harris, a black coat which the individual apparently had tossed also was recovered.
¶ 8. Wright was taken to Jackson Police Department headquarters, where she *812 spoke to Officer Reginald Cooper and was asked to participate in a photo lineup. After viewing photographs of a number of individuals, .Wright picked one and stated that this was the individual who had carjacked and kidnapped her a few hours before. ■ The individual in the photograph was Carteze Brazzle. In her testimony, Wright stated that she had provided a physical description of the individual and said the individual was wearing a black jacket at the time. Before the jury, Wright identified the defendant, Carteze Brazzle, as the person who both pulled a gun on her and entered her vehicle at Popeye’s.
¶ 9. Brazzle testified in his own defense. He admitted being in the red Tahoe that day, but denied kidnapping or carjacking Wright. According to his testimony, he and his friend Elliott Turner[2] had been riding around in a green Buick[3] which belonged to Turner’s girlfriend. The two were driving through west Jackson, when Turner had said, “I believe I know this female right here in this truck right here in front of us. I believe we used to talk in the past.” Brazzle, who was lying on the passenger’s side “asleep,” said he had “looked up, [saw] the truck, and [ ] laid on back down ... in the seat and continued to go back to sleep.”
¶ 10. Brazzle said when he awoke, they were in the Popeye’s parking lot. Brazzle told the jury, “I was laying there in the car, and [Turner] was, like, ‘Say, man.’ He bumped me, and he was, like, ‘Let me see your coat because it’s cold out here.’ “ Brazzle said he handed his coat to Turner, who then exited the vehicle; and then laid back down to sleep.
¶ 11. According to Brazzle, he lay there for “about fifteen minutes,” waiting on Turner to return, and then went inside Popeye’s to look for him. Brazzle said after searching the bathroom stalls, he remembered the “red truck” that Turner said, “he remembered the female that he used to talk to.” According to his testimony, Brazzle at that point saw “the truck leaving off Popeye’s lot going back towards Ford, Ford Company,” on Highway 80. Brazzle said he then got back in the green Buick, and waited for Turner to return. After sitting there for an undisclosed period, Brazzle said he decided to drive the vehicle around the building to look for Turner. When he saw that Turner was not there, Brazzle decided to “check this truck and see [if Turner] was in the truck with the girl before[.]”
¶ 12. Brazzle testified that he left Popeye’s and caught up with the Tahoe, and began “blowing and honking the horn.” The vehicle eventually pulled over to the side of the road, and Brazzle asked Turner, “Why did you leave me, man? Why did you leave me up there on the lot like that?” According to Brazzle, Turner’s only response was, “Just follow me to my girlfriend’s house. I just want to go give her car back.” Brazzle said he replied, “All right.”
¶ 13. Brazzle then told the jury, “So we go down the road some, and he pulled over again, and when he pulled over that time, he got out the truck and got to walking towards the car I was in, his girlfriend’s car.” According to Brazzle, Turner told him, “I don’t want my girlfriend to see you in her car because all she going to do is *813 get mad and want to argue.” Brazzle responded, “You sure right. I ain’t got time to be arguing with nobody else’s wife or girlfriend.”
¶ 14. Brazzle told the jury that as he was standing there talking to Turner, he began “shaking.” According to Brazzle, Turner then said, “You must be cold.” To which Brazzle responded, ‘Yeah.” Brazzle said that Turner then handed back his coat. Brazzle stated that Turner got in his girlfriend’s vehicle, and that he got in the Tahoe and proceeded to follow Turner down the road.
¶ 15. At this point in the testimony, the following exchange occurred between Brazzle and his attorney.
Q. Okay. At any time did you see the— you said he mentioned about a female in the truck earlier?
A. Yeah. He said he believed he talked to her. They had a relationship or whatever.
Q. When you got in the truck, was there anybody in the truck?
A. No, sir.
Q. Now, where did you go once you got in the truck? Where did y’all go?
A. When we got in — see, wasn’t no one in the truck when I got in the truck.
Q. When you got in it—
A. —I followed him—
Q. —in other words, you were in the truck, and where was Elliott?
A. I was following him. He was in his girlfriend’s car.
¶ 16. Brazzle said he followed Turner to the railroad tracks, where the two then stopped for an oncoming train. While waiting on the train to go through, a police officer pulled up behind Brazzle. According to Brazzle, the following occurred:
And as we’re sitting there waiting, the ... train finally went past, the sticks let up, and when they let up, the train went on by. And when they went on by, the other — another police coming from the opposite direction flying. So he was flying. He was coming down.
And as I looked at him coming down, I’m thinking he’s just fixing to fly on by, but he kind of, like, glanced over there at me like that, and he slammed on brakes, and slid all the way past me, sir.
And he threw the ear back in reverse, and when he threw it back in reverse, he jumps out and puts the gun up to the glass of the window. So it startled me, and I kind of pulled my head up and put my hands up and turned off the side of the road just to get away from the barrel of the gun.
So as I pulled off the side of the road, he started running to the truck. So I got out of the truck, and I screamed, “I didn’t do nothing. I ain’t did nothing.” And he kept running toward me with the gun. So I thought he was fixing to try to shoot.
So I stepped on the other side of the truck, and I kind of like I did run off into the woods to take the coat off so I could let them know that I wasn’t hiding nothing. So I went to the woods and took the coat off and threw it on the ground, and I come back out of the woods with my hands up.
¶ 17. Brazzle’s attorney then queried:
Q. Okay. Let me ask you this now. Why did you run in the woods?
A. Because I thought they was gonna shoot me, sir, because they was all cocking their guns running out behind me.
Q. All right. So what made you decide to come out of the woods?
A. When I got the coat off and let them know that I wasn’t hiding nothing, and I had my hands up.
*814 ¶ 18. After the close of the defense’s case-in-chief, Brazzle submitted jury instructions D-9 and D-10, which requested the jury be instructed on the lesser offenses of accessory after the fact and receiving stolen property, respectively.
¶ 19. The trial court denied both, reasoning:
And for the record D-9 and D-10 being lesser included and/or lesser related offense instructions, the Court is of the opinion there is simply not an evi-dentiary basis upon which to give these instructions.
In order to give these instructions the jury would have to be able from the evidence presented to theoretically find the defendant not guilty of the offense charged and to find him guilty of the lesser offense.
[[Image here]]
The elements of accessory after the fact are that a completed felony has been committed, that the accused concealed, received, relieved, aided or assisted a felon, knowing that such person had committed a felony, and such assistance or aid was rendered with the intent to enable such felon to escape or avoid arrest, trial, conviction or punishment after the commission of such felony.
And in the case at bar there’s simply no evidence ... presented by the defense through its only witness, the defendant, that he had any knowledge whatsoever that a felony had been committed and that any act upon learning that by him was with the specific intent to aid and assist that person, in this case one Elliott Turner, escaping or avoiding detection or arrest.
Similarly, a statutory element of receiving stolen goods is knowing at the time of receipt of the property that the property had, in fact, been stolen or under circumstances that the defendant reasonably should have known.
And in this case there is just no such evidence presented by the defense. The defense is I didn’t do it. Not that I didn’t do this, but I may have done that.
¶ 20. After which, the following exchange occurred:
By The Court: Does the defense [wish to be heard concerning any of the Court’s preliminary rulings]?
By Defense Counsel: Just, Your Honor, I feel by submission of D-10, of course I understand the Court’s ruling.
By The Court: Well, tell me what evidence I have concerning guilty knowledge.
By Defense Counsel: I believe, Your Honor, just his statement just as far as his testimony is concerned. That’s all. By The Court: Well, specifically, what did he testify to because I’m missing it. What did he say in his testimony that indicates that he had any clue that this car was even stolen, much less that there was a carjacking?
By Defense Counsel: None that I can recall, Your Honor, and I do understand the Court’s ruling.
Whether the trial judge erred in denying Brazzle’s requests for lesser offense instructions on accessory after the fact and/or receiving stolen goods.
¶ 21. Brazzle claims that “denial of either or both of the instructions was fundamental error in violation of his right to a fair trial and due process of law.” Brazzle asserts that, without these proposed instructions, he was precluded from presenting his theory of the case to the jury.
¶ 22. We disagree.
¶ 23. By submitting instructions D-9 and D-10, Brazzle attempted to have the jury charged on accessory after the *815 fact and receiving stolen goods.[4] Preliminarily, it is important to point out that, although the trial court passingly referred to both as lesser-included offenses and/or lesser-offense instructions, neither offense is a lesser-included offense of either of the two crimes for which Brazzle was indicted. Neither crime contains the essential elements required for the crime of kidnapping or carjacking. See Porter v. State, 616 So.2d 899, 909-10 (Miss.1993) (Hawkins, J., specially concurring) (“A lesser included offense by definition is one in which all its essential ingredients are contained in the offense for which the accused is indicted, but not all of the essential ingredients of the indicted offense. An accused could not be guilty of the offense for which he is indicted without at the same time being guilty of the lesser-included offense.”). Rather, both are entirely separate and distinct offenses. See Byrom v. State, 863 So.2d 836, 874 (Miss.2003) (“We have repeatedly held that the crime of accessory after the fact is an entirely separate and distinct offense and not a constituent part of a [principal] offense so as to be a lesser included offense.”) (quoting Wilcher v. State, 455 So.2d 727, 734 (Miss.1984), vacated in part, 635 So.2d 789 (Miss.1993)); see also Williams v. State, 595 So.2d 1299, 1303 (Miss.1992) (“Our law has long held one may not feloniously receive what he has stolen.”)
¶ 24. That said, this Court has said that a criminal defendant “may request an instruction regarding any offense carrying a lesser punishment if the lesser offense arises out of a nucleus of operative fact common with the factual scenario giving rise to the charge laid in the indictment.” Gangl v. State, 539 So.2d 132, 136 (Miss.1989) (quoting Griffin v. State, 533 So.2d 444, 447-48 (Miss.1988)). We have held this to mean not only lesser-included offenses but lesser offenses considered separate and distinct from the offense charged in the indictment. Id. at 135. The entitlement is limited, however, “in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.” Poole v. State, 826 So.2d 1222, 1230 (Miss.2002) (citation omitted) (emphasis added).
¶ 25. As with lesser-included-offense instructions, “lesser offense instructions should not be granted indiscriminately, and only where there is an evidentiary basis in the record.” Gangl, 539 So.2d at 136 (citing Harper v. State, 478 So.2d 1017, 1021 (Miss.1985)). “The evidentiary standard is the same as for lesser included offense instructions[.]” Id. (citing Harper, 478 So.2d at 1021).[5] In short, the defen *816 dant must point to evidence in the record from which a jury reasonably could find the defendant not guilty of the crime with which the defendant is charged and at the same time find the defendant guilty of the “lesser offense.” Dampier v. State, 973 So.2d 221, 231 (Miss.2008).
¶ 26. On appeal, Brazzle concedes that his testimony, if believed in its entirety, established a defense to any claim that he was an accessory after the fact or that he knowingly received stolen property. Braz-zle contends, however, that because a jury is entitled to believe or disbelieve witnesses in whole or in part, the jury could infer from the attendant circumstances in this case that there is sufficient evidence to support at least one of the proposed lesser-offense instructions. Specifically, Brazzle contends that, while Wright’s identification of Brazzle as the culprit supports an inference Brazzle actually carjacked and kidnapped Wright, the jury also was free to believe that she was mistaken about her identification and find that Braz-zle had acquired the vehicle from Turner after the fact, as he claimed.
¶ 27. This argument fails. For support, Brazzle relies on Warren v. State, 709 So.2d 415 (Miss.1998), in which this Court reversed a trial court’s refusal to grant the defendant’s request for a lesser-included-offense instruction on the crime of trespass. There, the defendant was indicted by a grand jury on the crime of voyeurism, specifically alleging that he “peeped through a window of James’ house with a lewd, licentious and indecent purpose.” Warren held:
Warren is guilty of voyeurism only if the jury believed all of what James had to say including her testimony suggesting Warren’s lewd purpose for being on her property and looking through her window. Likewise, he is guilty only of trespassing if the jury decided to believe everything that James stated except that portion of her testimony suggesting Warren’s lewd purpose. Thus, contrary to the State’s contention, there was evidence to support the lesser included instruction on trespassing, and the instruction should have been given.
Warren, 709 So.2d at 420.
¶ 28. We find Warren distinguishable. Warren was based on the denial of a lesser-included-offense instruction. Warren, 709 So.2d 415. All the “essential ingredients” of the crime of trespass were contained in the offense for which the defendant, Warren, was alleged to have committed. Porter v. State, 616 So.2d at 909-10; Warren, supra. Thus, as the *817 Warren Court found, if the jury disbelieved Warren’s denial that he was ever at James’s house, and believed “everything James stated except that portion of her testimony suggesting Warren’s lewd purpose!,]” evidence still remained to support the lesser-ineluded-offense of trespass. Warren, 709 So.2d at 420. This is because, based on the attendant facts in its case, in order for the State to prove the alleged crime of voyeurism, it also would have had to prove that Warren had been on James’s property without her permission.
¶ 29. Here, however, we do not have at issue a lesser-ineluded-offense to the two greater offenses charged in Brazzle’s indictment. Rather, as previously mentioned, we have two lesser offenses clearly separate and distinct from those charged, both of which require proof of a crime committed by someone other than the defendant.[6] And, as the trial court found, there is no evidence in the record that Brazzle had any knowledge that either a felony had been committed (one of the elements of accessory after the fact), or that the Tahoe had been stolen (one of the elements of receiving stolen property), by another.
¶ 30. According to Brazzle’s version of the facts, he was with an individual named Turner, in Turner’s girlfriend’s green Buick, when Turner saw and noticed a woman he knew driving a red Tahoe. Brazzle fell asleep, ended up in Popeye’s parking lot, and Turner borrowed his black coat on account of the cold weather. Turner then left the vehicle, and Brazzle went back to sleep. After fifteen minutes passed, Brazzle, acting on his inclination that Turner possibly had left Popeye’s in the Tahoe with the woman, drove the green Buick out of Popeye’s parking lot, caught up with the Tahoe, and flagged it over to the side of the road. After asking Turner why he had left, Brazzle was told only that he needed to return Turner’s girlfriend’s car.
¶31. Additional testimony said that Brazzle and Turner thereafter switched vehicles in order to avoid a girlfriend’s wrath, and that Brazzle’s black coat was returned to him. The testimony shows that, while Brazzle and Turner were stopped at railroad crossing waiting for a train to pass, a police vehicle pulled in behind Brazzle. When the train finally passed and “the sticks let up,” another police vehicle, which Brazzle described as “flying,” approached from the opposite direction. Brazzle’s thinking at this moment, according to his testimony, was that the police vehicle was “just fixing to fly on by.” When — as the testimony indicated— it did not, Brazzle pondered why. Brazzle explained that, when a police officer emerged from the vehicle and placed his gun up to the glass of the window, Brazzle became “startled.” So he “turned off the side of the road just to get away from the barrel of the gun.” According to his testimony, Brazzle got out of his vehicle screaming, “I didn’t do nothing.” When the officer kept approaching, Brazzle “thought he was fixing to try to shoot.” So he stepped on the other side of the truck, ... [ran] off into the woods to take the coat off so [he] could let them know that [he] wasn’t hiding nothing.”
*818 ¶ 32. By contrast, the State presented evidence through Wright’s testimony that, while at the Popeye’s drive-through, Braz-zle, by show of a gun, entered her vehicle and absconded with both it and Wright from the restaurant’s parking lot. Wright soon escaped, called the police, and thereafter identified Brazzle as the culprit from a photo lineup. She identified Brazzle again at trial.
¶ 33. The State presented additional evidence that, before word went out over radio from police dispatch, Officer Harris had been informed of the incident by a motorist. Harris eventually caught up with the Tahoe and flashed his emergency blue lights. Accordingly, the driver of the vehicle attempted to flee off-road before becoming stuck. The driver of the vehicle, later identified by Officer Harris as Braz-zle, then ran into the woods before-being apprehended.
¶ 34. With Harper in mind, when taking the evidence in the light most favorable to the Brazzle, and considering all reasonable favorable inferences which may be drawn in- favor of Brazzle from the evidence, we find that no reasonable jury could find Brazzle guilty of either accessory after the fact or receiving stolen property without resorting to speculation' or conjecture. Harper, 478 So.2d at 1021. Based on our review of the record, there simply is no evidentiary basis to support the requisite knowledge element for either lesser-offense instruction. See Miss.Code Ann. §§ 97-17-70 and 97-1-5 (Rev.2006).
¶ 35. Despite the dissent’s somersault logic to the contrary, any evidentiary question, such as whether or not another individual by the name of Turner actually was involved in the case; or whether or not a green Buick was in the area; or any inconsistencies between Officer Harris’s version and Brazzle’s as to what occurred at the railroad crossing, all were factual issues for the jury to resolve on the question of Brazzle’s guilt or innocence of the two crimes for which he was indicted. The dissent’s assertion that “the majority sets a dangerous precedent and deals a substantial blow to the rights of criminal defendants in this state” is absurd.
¶ 36. The State’s evidence, along with Brazzle’s version of events, was submitted to the jury for its assessment in deciding how much, if any, weight and credibility it was willing to place with each. Any reasonable doubt as to the State’s proof of Brazzle’s role in these two crimes entitled Brazzle to nothing short of an absolute discharge’
CONCLUSION
¶ 37. The judgment and sentences of the Circuit Court for the Second Judicial District of Hinds County are affirmed.
¶ 38. COUNT I: CONVICTION OF CARJACKING AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF KIDNAPPING AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNTS I AND II TO RUN CONSECUTIVELY.
WALLER, C.J., CARLSON, P.J.,' DICKINSON, RANDOLPH, LAMAR AND CHANDLER, JJ., CONCUR. GRAVES, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.

. Although the caption of this case spells Brazzle’s first name differently, this is how Brazzle spelled it at trial.

. Officer Cooper stated during cross-examination that, as a part of his investigation, he spoke with a man named Elliot Turner on the telephone; the contents of that discussion are not revealed in the record.

. According to Officer Cooper, Officer Harris had noted in his report that he had observed a green Buick following the victim's carjacked vehicle.

. The crime of accessory after the fact, is set forth in Mississippi Code Section 97-1-5, which states:
Every person who shall be convicted of having concealed, received, or relieved any felon, or having aided or assisted any felon, knowing that such person had committed a felony, with intent to enable such felon to escape or to avoid arrest, trial, conviction or punishment, after the commission of such felony....
Miss.Code Ann. § 97-1-5 (Rev.2006).
The crime of receiving stolen property is governed by Section 97-17-70, which states in pertinent part:
(1) A person commits the crime of receiving stolen property if he intentionally possesses, receives, retains or disposes of stolen property knowing that it has been stolen or having reasonable grounds to believe it has been stolen, unless the property is possessed, received, retained or disposed of with intent to restore it to the owner.
Miss.Code Ann. § 97-17-70 (Rev.2006).

. Harper explained:
The rule on whether a lesser included offense instruction should be given is functionally comparable to that applied when the trial judge considers whether a peremptory instruction or judgment notwithstand *816 ing the verdict should be granted[.] The only fact issues which should be taken from the jury are those with respect to which the evidence is so clear that rational jurors could not disagree. On all other material issues of fact, the jury must be instructed in the law so that they may then perform their constitutional responsibility.
The rule here, however, is the opposite of that which prevails when the defendant requests a peremptory instruction at the conclusion of the state's case. There we say that the evidence must be viewed in the light most favorable to the state and that we must accept as true all evidence supporting conviction even though that evidence may be contradicted by evidence offered by the defendant. We also give the state the benefit of all reasonable favorable inferences which may be drawn from the evidence. Conversely, in the present context, a lesser included offense instruction should be granted unless the trial judge-and ultimately this Court-can say, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one essential element of the principal charge).
Harper, 478 So.2d at 1021.

. It should be noted that Gangl, which opened the door to permitting instructions based on a lesser offense separate and distinct from the offense charged in an indictment, involved the lesser offense of accessory after the fact and the greater offense of accessory before the fact. Gangl, 539 So.2d at 135. The Gangl Court made it a point to note that no evidence was presented showing that the defendant was a participant in the robbery at issue in that case. See id. (“It is important to note here that no evidence, direct or circumstantial, implicated Gangl as a primary participant in the armed robbery”).