# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-00065-SCT

*JERRIAN DONALD HORNE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 7/6/1999 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PAMELA LUCKIE CASTLE |
| | CLIFTON S. GADDIS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY |
| DISTRICT ATTORNEY: | E. LINDSAY CARTER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/22/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/1/2002 |

**BEFORE SMITH, P.J., WALLER AND CARLSON, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. After a change of venue to Harrison County, Jerrian Donald Horne was convicted of aggravated assault and capital murder. The Forrest County Circuit Court sentenced him to twenty (20) years in the custody of the Mississippi Department of Corrections on the aggravated assault conviction and life imprisonment without possibility of parole on the capital murder conviction, said sentences to run consecutively.

¶2. On appeal, Horne raises issues pertaining to jurisdiction, jury selection, admissibility of incriminating statements, identification testimony, prosecutorial misconduct, demonstrative evidence, pre-sentence report and investigation, and proportionality of the life sentence. We affirm Horne's conviction and sentence.

## FACTS

¶3. Two African-American males, one wearing a ski mask and one wearing a bandanna over his face,

entered "Uncle Guy's Quick Stop," a convenience store on Edwards Street in Hattiesburg, Forrest County, Mississippi. The male wearing the ski mask was armed with a sawed-off rifle, and the one wearing a bandanna was armed with a revolver. The male wearing the ski mask shot and killed Myong Cheon Son. The male wearing the bandanna shot and injured his sister, Myong Ja Son ("Ms. Su"). When the police arrived, Ms. Su informed them that she recognized the male wearing the ski mask because he came into the store every day. She gave a description of her assailants to the police. She described the one who shot her brother (the one who wore the ski mask) as being an African-American male with light or blue eyes and with light skin and also told them where he lived. Though his hair was concealed by the ski mask, she further advised the officers of his distinctive hair color, described at different times as yellowish-orange or yellow and red. She related that a videotape recorded the entire incident.

¶4. From viewing the videotape, the police ascertained that the suspects were wearing light-colored, short-sleeve t-shirts and long dark pants and carrying a sawed-off rifle and a revolver. The suspects were in the store only a matter of seconds. One was wearing a ski mask, and the other had a bandanna over his face.

¶5. A police officer gave the description of the assailants to Police Officer Charles DeJarnette, who arrived late at the scene and who said he knew the suspect who shot Myong Cheon Son. He went to the house described by Ms. Su. Jerrian Horne, who was fourteen years old at the time, lived there with his father, David Anderson, and his grandmother. Horne answered the door and, after Officer DeJarnette asked Horne where he had been that night, Horne responded that he had been at Essie Ellis's house with some friends. This initial contact was made at approximately 10:30, within two hours after the shootings. Officer DeJarnette asked Horne's father if he could take Horne to the Ellis house, and Horne's father agreed. Horne remained in the patrol car while Officer DeJarnette questioned Ellis, who stated that she had seen Horne earlier outside one of the windows to her house. Later, the sawed-off rifle was found underneath the same window, partially hidden.

¶6. Officer DeJarnette arrested Horne and took him to the police station. Officer DeJarnette called Horne's father to tell him that his son had been arrested. Horne's father came to the police station but never requested to see his son and Horne never requested to see his father. Officer DeJarnette read Horne his rights, and Horne signed a waiver of rights form. Horne informed Officer DeJarnette that he had smoked some marijuana, but Officer DeJarnette stated that Horne was able to understand what Officer DeJarnette was saying and vice versa. Officer DeJarnette again read Horne his rights, and Horne signed the waiver form. Horne gave a statement to Officer DeJarnette, which was later reduced to writing. Then Horne "confirmed his statement" while he was being videotaped. All of these interviews occurred within hours of the shootings.

¶7. Meanwhile, during the same evening, another police officer, Terry Gibson, went to the Forrest General Hospital to interview Ms. Su. She spoke through an interpreter who was her niece. Officer Gibson testified at the suppression hearing concerning Ms. Su's statements concerning the shootings, description of the suspect and knowledge of where the suspect lived as follows:

> She told me that two black males entered the store, one had a mask on and one had something wrapped around his face, one had a pistol and one had a rifle. She said that they did not say anything, that they shot her twice and shot Myong Cheon Son twice, and then left the store. She said that at first, when the first came in, she thought it was a joke because she knew them; they frequented the store regularly, and they had been there earlier, at about 3:00 that afternoon. She said that the one

with the rifle, she described him as a black male with red hair and blue eyes, and she said she believed he lived with his grandmother on Magnolia Street in a pink house. I asked her where. She said if you were coming off of Edwards Street, it would be the second house on the right. And she also said there was a house next-door with a fence around it.

¶8. At the suppression hearing, Ms. Su testified in detail concerning the description of the suspects and the weapons used as follows:

BY THE STATE: . . . Did anything unusual happen?

\* \* \*

BY MS. SU: 1997. July 29, 8:30 p.m., two black guys come inside store. One of them big gun, one of them small gun, shooting the rifle at my brother and me.

\* \* \*

Q. Okay. How were they dressed on that occasion? How was the one with the little gun dressed?

A. Little gun just like this one.

Q. I know, but, I mean, did he have anything on his face? The man with the little gun, did he have anything on his face?

A. I don't understand.

Q. I said, did he have a mask or anything on his face?

A. Oh, yes, sir. It's a 14 year old boy. He had a mask, ski mask.

Q. Could you see any part of his face through that ski mask?

A. Ski mask -- he had a space with his eyes. I see eyes. They were colored eyes.

\* \* \*

A. He come in, opened the door, and I was watching, just like watching TV, standing up. He got the gun and put it in our face. I think he joking. He come in every day, one day eight times. I said, Oh, my God. Oh, my God. I was watching TV.

Q. Now, let me stop right there. The one you was waving at and saying, Move the gun, was that an older one or younger one?

\* \* \*

A. The older one had small gun; the 14 year old Jerrian Horne, had big gun.

\* \* \*

Q. All right. The one that had the rifle, did you see any facial features about him?

A. I know he had a mask on. He had blue eyes.

Q. Blue eyes?

A. Blue eyes.

Q. Could you see his eyes through the mask?

A. Yes. I see them. He's got a ski mask on. I look in the eyes.

Q. About what size was he.

A. Six feet.

Q. Six feet?

A. Almost six feet.

Q. Can you give me an estimate of how much he weighed?

A. At that time a hundred and fifty-something.

Q. All right. Did you know these two boys before?

A. Yes.

Q. How did you know them?

A. They come at 3:00 my store. He come every day. One time eight times. Every day.

* * *

Q. And the one in particular that shot your brother with a rifle, you say what color eyes did he have?

A. It's a blue color.

Q. Okay. And did you have any more customers that came in your store over a period of months that had blue eyes?

A. No. Only him. Black guy, him got this blue eyes.

* * *

[After in-court identification.]

Q. Is his hair any different today than it was back then?

A. Yes. It's at this time different. At that time orange color, yellow and orange colored hair.

Q. All right. And what's different about his hair?

A. Now he got no hair.

Q. Oh, he's cut it off?

A. Yes. . . .

* * *

BY MR. GADDIS (for the defense): Now, if you can only see eyes -

A. Eyes and body.

Q. Eyes and body?

A. Yes.

Q. But not hair?

A. Not hair. He got the mask on.

Q. Right. Now, his skin is light.

A. Yes.

Q. Very light.

A. Yes.

* * *

Q. . . . Now, so you see blue eyes, skin like yours, ski mask and long gun. That's what you see, okay? Is that right?

A. Yes, sir.

Q. All right. Now, police come.

A. Yes.

Q. All right. And you tell police blue eyes, red hair; is that right?

A. Yellow hair.

Q. Yellow hair.

A. Yellow hair. He got yellow hair.

¶9. The trial court denied Horne's motion to suppress the in-court identification.

## DISCUSSION

### I. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING HORNE'S MOTION TO TRANSFER FROM CIRCUIT COURT TO YOUTH COURT.

¶10. Because one of the crimes of which Horne was accused, i.e., capital murder, was punishable by death or life imprisonment, the circuit court had original jurisdiction over this matter despite the fact that Horne was 14 years old at the time of the crime. Miss. Code Ann. § 41-21-151(1)(a) (2000). The circuit court *could*, however, transfer the case to the youth court if it found that it was in the best interest of the minor and in the interest of justice. Miss. Code Ann. § 43-21-159(4) (2000). The power to transfer the case is clearly *permissive*, not *mandatory*.

¶11. The standard of review for a denial of a motion to transfer to youth court is abuse of discretion. ***State v. U.G.***, 726 So. 2d 151, 154 (Miss. 1998).

¶12. Horne makes much of the decision of ***State v. U.G.***, where we made it mandatory for a circuit court to consider two factors when ruling on a motion to transfer to youth court: whether the transfer would be in the (1) best interest of the minor; and (2) interest of justice. ***Id.*** at 155. The record shows that, in denying the motion to transfer, the circuit court did not make any findings as to these two factors.

¶13. Even though the trial court heard argument of counsel on Horne's motion to transfer, the record is devoid of any evidence which would support a finding that a transfer would be in Horne's best interest or in the interest of justice. The only facts in support of the motion presented by Horne were his age (14) , his educational background (9th grade) at the time of the crime, and the fact that he had no prior criminal record with the youth court.

¶14. On the other hand, it would be in the interest of justice to prosecute such a heinous crime in circuit court, where an appropriate punishment could be meted out. It was not necessary to murder Myong Cheon Son. He had no opportunity to present a defense to the two intruders; indeed, they were in the store only 15 seconds -- not enough time for anyone to react. The acts of the perpetrators demonstrate a clear lack of conscience. The perpetrators needed to be dealt with harshly, no matter their ages.

¶15. We find that, even though the circuit court erred by not considering the two factors under ***State v. U.G.***, this error was harmless.

### II. WHETHER THE CIRCUIT COURT'S FINDING OF NO PRIMA FACIE CASE OF DISCRIMINATION DURING VOIR DIRE WAS CLEARLY ERRONEOUS.

¶16. Horne, who is African-American, claims that the State engaged in racial discrimination in the selection of the jury in contravention of ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and that the fact that the final jury panel was all-white supports this claim. He also cites ***Puckett v. State***, 788 So. 2d 752 (Miss. 2001), where we held that, even though the State used eight of its peremptory strikes against Caucasians and only four against African-Americans, a prima facie showing of racial discrimination was made because an all-white jury was empaneled and the State's four peremptory challenges were made against the only four African-American veniremen in the jury pool. Also, the defense introduced statistical evidence which showed the racial make-up of the county from which the jury pool was drawn. In the case sub judice, the record shows that the State used ten of its twelve peremptory challenges, six against Caucasian veniremen and four against African-Americans. The alleged discriminatory conduct was that the State struck the *only* African-Americans considered by the parties for service on the jury, leaving an all-white jury.[1] The trial court found that no prima facie showing of racial discrimination had been made by the defense and therefore did not require the State to give race-neutral reasons for its use of its peremptory challenges.

¶17. After a **Batson** objection has been made, a defendant must show that he is a member of a cognizable racial group, that the State has peremptorily challenged members of his race and that the facts and circumstances of the peremptory strikes indicate that the sole reason for the challenge was to indulge in racial discrimination. *See, e.g., Tanner v. State*, 764 So. 2d 385, 393 (Miss. 2000). The essential inquiry, however, is whether the defendant has met the burden of showing that the State has engaged in a pattern of strikes based on race or gender, i.e., whether "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Randall v. State*, 716 So. 2d 584, 587 (Miss. 1998).

¶18. Here, Horne clearly showed that he was a member of a cognizable racial group and that the State had exercised its peremptory challenges against persons of his race, so the analysis must proceed to whether sufficient race-neutral reasons were given in support of the strike.

¶19. The State used peremptory strikes against the following venirepersons:

### A. Eugene Dixon

¶20. Dixon did not indicate on the "Juror Information Card" whether he was married, and, if so, the name and employment of his wife; how long he had lived in Harrison County, and how long he had been employed by Grand Casino as a hood cleaner. The State struck Dixon because he was unresponsive on the card.

¶21. Horne counters by arguing that seven of the unanswered questions concerned Dixon's marital status, children and possible retirement, and since Dixon was only 26 years old, he was obviously unmarried, without children, and without retirement prospects. Furthermore, the State accepted two other venirepersons who did not completely respond to the juror information card.

¶22. We find that the State's reason for striking Dixon was race-neutral. Horne's argument does not address Dixon's failure to state how long he had lived in Harrison County and how long he had been employed. Just because someone is 26 and presumably unmarried does not mean that he has no children. The State struck Dixon because, without any more information about Dixon's work history and family life, not knowing how long Dixon had resided in Harrison County, and given Dixon's youth, the State could reasonably conclude that Dixon was more or less irresponsible and somewhat unstable. We have previously found these reasons to be race-neutral. *See, e.g., Davis v. State*, 660 So. 2d 1228, 1242 (Miss. 1995).

### B. Veronica Burns

¶23. Burns had been a victim of an aggravated assault and seemed inattentive during voir dire. Horne counters that, even though Burns was the victim of a crime, the crime was committed about 20 years prior to the voir dire, and she stated that she was satisfied with the outcome of the criminal proceedings and her experience would not affect her during the trial.

¶24. Inattentiveness alone has been accepted as a race-neutral explanation for the exercise of a peremptory strike. *Puckett*, 788 So. 2d at 760. Therefore, inattentiveness, combined with the fact that Burns was the victim of a crime, are more than sufficient reasons to overcome any presumption that Burns was struck because of her race. *See Tanner*, 764 So. 2d at 394 ("It can hardly be said that striking a juror who has been the victim of a crime or attempted crime is racially motivated.").

### C. Gwendolyn Anderson

¶25. Anderson stated on the "Juror Identification Card" that she was employed as a cashier, but did she did not identify her employer. She neither gave her employer's telephone number nor stated how long she had been employed. She had been a victim of a crime many years prior thereto and had a son who worked with the Biloxi Police Department. Finally, the State felt that, since she was a cashier, and the instant case involved the shooting of a cashier, she would be biased in some way. However, even with all these reasons, the State averred that the main reason it used a strike against Anderson was because she was unresponsive.

¶26. Horne points out that the record shows that Anderson stated that she hardly ever communicated with her police officer son and that she would not credit law enforcement witnesses with any more credibility just because they were in law enforcement.

¶27. We find that the combination of factors stated above (little information about her employment history, a relative in law enforcement, and being a victim of a crime) constitute a sufficient race-neutral reason for the exercise of a peremptory strike.

D. Wilford Bishop, Jr.

¶28. Bishop was a preacher and requested to be excused from jury service because he would begin "pastoring a congregation" in the next few days. A concern that a venireperson who has asked to be excused would be preoccupied is a sufficient race-neutral reason for the use of a peremptory strike. *Turner v. State*, 573 So. 2d 657, 662-63 (Miss. 1990). Also, the use of a peremptory strike against a minister is race-neutral because of the minister's perceived sympathy and compassion. *Lockett v. State*, 517 So. 2d 1346, 1351 (Miss. 1988).

¶29. We find that the State had sufficient race-neutral reasons to exercise its peremptory strikes against these four venirepersons. The record does not show that any Caucasian venirepersons who shared these same characteristics were chosen as jurors.

### III. WHETHER THE CIRCUIT COURT ERRED IN DENYING HORNE'S MOTION TO SUPPRESS IDENTIFICATION TESTIMONY.

¶30. After a hearing, the court, in denying Horne's motion to suppress, found that, despite an effort to disguise Horne's appearance, sufficient details confirming Horne's identity were made as follows:

The Court further finds that the victim, Myong Ja Son, testified that on the night of the incident that two black males came to her store. One was wearing a bandanna with a pistol and she could see his face. The other defendant was wearing a ski mask; however, she could recognize the eyes of the defendant, which were blue. She also could see his skin and his physical size, and she recognized that she knew both of the individuals as they came in her store on a daily basis and had been in there at 3:00 the afternoon of the incident. She testified that she knew the defendant by the name of Jerrian Horne and identified him in court.

The Court further finds that the scene was a well-lighted convenience store and that she had reasonable time and circumstances to observe the defendants, even though one had a bandana and one had a ski mask, and that the defendant who was wearing it, whom she identified as the gunman with the rifle had blue eyes which she said she could clearly see as the mask did not cover his eyes. She could also see his body and identified him as being the one who fired the .22 rifle that struck her

brother.

The Court finds that after considering all of the evidence beyond a reasonable doubt and the totality of the circumstances, that the Motion to Suppress the Identification Evidence be and the same is hereby denied.

¶31. The admission of evidence rests within the discretion of the trial court. *Baine v. State*, 606 So. 2d 1076, 1078 (Miss. 1992); *Wade v. State*, 583 So. 2d 965, 967 (Miss. 1991). A court must consider five factors in evaluating the validity, reliability and admissibility of identification testimony: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty exhibited by the witness at the confrontation; and (5) the time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972); *York v. State*, 413 So. 2d 1372, 1381 (Miss. 1982).

¶32. The standard of review for suppression hearing findings concerning pretrial identification is "whether or not substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted. . . . The appellate review should disturb the findings of the lower court 'only where there is an absence of substantial credible evidence supporting it.'" *Ellis v. State,* 667 So. 2d 599, 605 (Miss. 1995) (citations omitted).

¶33. Usually a criminal defendant challenges the first identification made of him by a victim such as during a photographic array or a line-up. Here, Horne challenges the later in-court identification of him by Ms. Su, presumably because she added some detail to her description of him. Horne does not challenge her first and second identification other than to claim, during oral argument, that the color of his eyes did not match Ms. Su's description.

¶34. Applying the *Neil* factors to the case at hand, we find as follows:

(1) *The opportunity of the witness to view the criminal at the time of the crime*.

¶35. Ms. Su testified that Horne stood by her brother while the other assailant stood by her. However, all four were in close quarters as Ms. Su and her brother were watching television behind the counter when the two assailants entered the store. By watching the videotape, the police determined that the whole scenario played out in a matter of seconds. Ms. Su testified that the store was well lighted at the time of the crime.

(2) *The witness' degree of attention.*

¶36. Even though Ms. Su and her brother were watching television when the two assailants entered the convenience store, Ms. Su testified that she thought the two assailants were joking at first because she immediately recognized both of them.

(3) *The accuracy of the witness' prior description of the criminal.*

¶37. Ms. Su's first description (given at the convenience store) of the assailant was so accurate that it immediately caused Officer DeJarnette to look for Horne. When the police first arrived at the convenience store, Ms. Su stated that her assailant had "distinctive colored eyes, blue eyes and blondish-red hair, and that he lived [in] the second house on Magnolia, off Edwards Street. She was sure of the identity of her

assailant because he had come into her store on a daily basis. A short while later at the hospital, Ms. Su told the police that assailant was a black male with red hair and blue eyes, and that he lived on Magnolia Street in a pink house.

(4) *The level of certainty exhibited by the witness at the confrontation.*

¶38. Ms. Su was unshakable in her identification of Horne in the courtroom even though he had cut all of his hair off and his attorney argued that the color of his eyes were different from the color described by Ms. Su.

(5) *The time between the crime and the confrontation.*

¶39. Roughly two years passed between the shootings and the trial.

¶40. We find that the circuit court did not err in denying the motion to suppress. Ms. Su said she immediately recognized the two assailants when they entered the store even though she and her brother were watching television. It is reasonable to believe that she redirected her attention toward the assailants almost immediately after their entry into the store because they had covered their faces and were carrying weapons. Horne makes much of the fact that they were in the store for only a matter of seconds, but we find that the short time frame did not render Ms. Su's testimony inadmissible; rather, the short time frame was a factor to be considered in the jury's assessment of Ms. Su's credibility. Ms. Su's first and second descriptions of Horne, both given the same night as the incident, were very accurate. Again at trial, two years after the shootings, Ms. Su was certain in her identification of Horne.

¶41. Based upon these factors, credible evidence exists to support the circuit court's determination that there was no substantial likelihood of misidentification in allowing the in-court identification. Therefore, we find this assignment of error to be without merit.

### IV. WHETHER THE CIRCUIT COURT ERRED IN DENYING HORNE'S MOTION TO SUPPRESS STATEMENTS.

¶42. Horne contends that, as a result of his age and intoxication, he was unable to give a knowing and intelligent waiver of his rights. After a hearing, the circuit court found that Horne was properly advised of his rights, that he waived the same, and that the confession was free and voluntary.

¶43. The general rule is that for a confession to be admissible it must have been given voluntarily and not given because of promises, threats or inducements. *Dancer v. State*, 721 So. 2d 583, 587 (Miss. 1998) (citing *Morgan v. State*, 681 So. 2d 82, 86 (Miss. 1996)). "[T]he prosecution shoulders the burden of proving beyond a reasonable doubt that the confession was voluntary." *Morgan*, 681 So. 2d at 86 (citing *Haymer v. State*, 613 So. 2d 837, 839 (Miss. 1993)). This "burden is met and a prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offer of reward." *Morgan*, 681 So. 2d at 87.

¶44. Our review of whether Horne's confessions were voluntary is limited. The circuit court sits as a fact finder when determining voluntariness of a confession, and its determination will not be reversed unless manifestly wrong. *Blue v. State*, 674 So. 2d 1184, 1204 (Miss. 1996), *overruled on other grounds by* *King v. State*, 784 So. 2d 884 (Miss. 2001); *Porter v. State*, 616 So. 2d 899, 907 (Miss. 1993). The State has the burden of proving all facts prerequisite to the admissibility of a defendant's confession beyond a reasonable doubt. *Blue*, 674 So. 2d at 1204; *Porter*, 616 So. 2d at 908.

¶45. We have held that, if the nature of the crime is one where the defendant could receive life imprisonment or death and if original jurisdiction in the case lies in the circuit court, it is not necessary that a minor have a parent present during interrogation. *Blue*, 674 So. 2d at 1205. Horne's age has "no special bearing on his ability to be questioned without a parent and voluntary waive his rights." *Id.*

¶46. Although Horne had been drinking and/or smoking marijuana prior to his arrest, Officer DeJarnette, Officer Adrian Dejuan Ratliff and Detective Richard Cox, who typed Horne's statement, testified that he did not appear intoxicated at the time of his arrest. The evidence, including the videotape which did not depict Horne in a state of intoxication, overwhelmingly established that intoxication was not a factor when Horne gave his statements.

¶47. There is no evidence in the record that Horne was coerced, threatened or enticed into giving his statements. The record does show that Horne was advised of his *Miranda* rights on at least two separate occasions after he was taken into custody. He waived those rights each time he was so advised. The officers who took Horne's statement each testified that Horne voluntarily made his statement and that no threats or promises or other form of coercion were brought to bear upon him. This evidence is supported by the videotape wherein Horne reiterated that he was cognizant of his rights, that he waived them, and that he freely and voluntarily gave the statements.

¶48. We find that, because there is substantial evidence indicating that Horne understood his rights and voluntarily waived them, the circuit court's decision finding Horne's confessions admissible was not in error. There is no merit to this issue.

### V. WHETHER THE CIRCUIT COURT ABUSED ITS DISCRETION IN DENYING HORNE THE OPPORTUNITY TO SHOW THE JURY THE COLOR OF HIS EYES.

¶49. Horne complains that the circuit court would not allow him to show the color of his eyes to the jury unless he testified. In other words, Horne wished to establish an evidentiary fact (that the color of his eyes may or may not have been the color testified to by the State's witnesses) without taking an oath, testifying, or allowing the State to cross-examine him.

¶50. Defendants in criminal cases have been required to show a physical characteristic such as a scar in court, and such demonstrations have been held not to be a violation of the privilege against self-incrimination. *Lewis v. State*, 725 So. 2d 183, 188-89 (Miss. 1998); *Porter v. State*, 519 So. 2d 1230, 1232 (Miss. 1988). However, where such demonstrations have occurred, there is no dispute as to the physical characteristic's particulars. In *Lewis*, for example, defense counsel requested that Lewis try on a pair of shoes to see if they fit. There was no issue of fact as to whether the shoes were his or as to whether they were on his feet when he was arrested. In the case sub judice, the color of Horne's eyes was very much disputed.

¶51. Horne's demonstration of the color of his eyes was irrelevant if there was no accompanying testimony that the color of his eyes on that particular day of trial was the same as on the day of the shooting. No proffer of such testimony was presented by the defense.

¶52. Nevertheless, the jury was able to observe Horne and the color of his eyes throughout the week-long trial. In fact, defense counsel specifically called the jury's attention to Horne's eyes during closing argument. If the circuit court erred by not allowing Horne's demonstration, it was harmless error.

## VI. WHETHER THE CIRCUIT COURT ERRED IN DENYING HORNE'S MOTION FOR MISTRIAL BASED ON PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT.

¶53. Although parties are given great latitude in closing arguments, ***Dunaway v. State***, 551 So. 2d 162, 163 (Miss. 1989), an improper closing argument may constitute reversible error if the "natural and probable effect of the prosecuting attorney's . . . argument created unjust prejudice against the accused resulting in a decision inflated by prejudice." ***Id.***

¶54. Horne contends that the following argument by the State "instructed the jury to stop the crime and gang activity in the neighborhood and to protect the community and to stop crime":

> And let me tell you the sad part of this case, and I'm going to close with this. Mr. Gaddis asked Ms. Essie Ellis -- she asked Ms. Essie Ellis about the gangs. And that incident was the day before, I believe, if I remember the testimony -- night before this happened. But she asked her was it a dangerous -- yes, sir. Do you have gangs there? Do you have drug dealers there? Yes, you do. It's a bad neighborhood, isn't it? Yes. I can't go out at night. I can't go out at night. Here we are in the United States of American and people are a prisoner to their own home. They can't go out at night because of drugs and guns and gangs.

> * * *

> Yes sir. I'm fixing to finish it. You see, that's what happens, and when you look the other way, if you're in law enforcement, whatever profession you're in, and you walk by and look the other way when you know something's wrong and you ought to do something about it, then you've got to do something about it under the law. You create a new stand.

> * * *

> Maybe he's entitled to consideration, but we can't give it to him. We don't know. We have no way under the law. Our duty is to try to enforce the law and to protect everybody in that community. It's a tough, tough job, 24 hours a day, but especially when people are armed with these kinds of things. And I'm not going to hold us up here anymore, but his is not a 14 year old's toy. This is a killing machine. And you know the old saying? Guns don't kill people; people kill people. I agree with that. This gun couldn't have walked in that place and loaded itself and fired. People do it.

¶55. Horne has misinterpreted the State's remarks. The prosecutor did not "instruct the jury" to stop crime and clean up neighborhoods. He stated that it was the duty of people who work in law enforcement to stop crime and clean up neighborhoods. And Horne opened the door to the State's remarks about gang activity when he examined a witness about gang activity in the neighborhood.

¶56. This claim is without merit.

## VII. WHETHER THE CIRCUIT COURT ABUSED ITS DISCRETION IN FAILING TO ORDER A PRE-SENTENCE INVESTIGATION AND REPORT.

¶57. Because Horne was a juvenile and the death penalty was unavailable, the circuit court sentenced him to the only sentence currently available for capital murder, life imprisonment without parole. Ostensibly,

there are two "life" sentences available, one with and one without parole. However, under Miss. Code Ann. § 47-7-3(1)(f), the Legislature has taken away the simple life sentence in capital murder cases: "No person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19-101." *See also **Pham v. State**,* 716 So. 2d 1100, 1103 (Miss. 1998) ("[A]lthough under the relevant code provisions, while there is the apparent necessity of a choice between death, life, and life without parole, in reality there is really only a choice between death and life without parole in the capital case in this context."). Because there was no discretion in the sentence for the murder conviction to be imposed, we cannot find that the circuit court abused its discretion in failing to order a pre-sentence investigation and report.

## VIII. WAS THE SENTENCE DISPROPORTIONATE TO THE CRIME?

¶58. As discussed above, the circuit court had no discretion to sentence Horne to anything but life imprisonment on the murder conviction. Moreover, Horne never asked the circuit court to perform a proportionality review; therefore this claim is procedurally barred.

## CONCLUSION

¶59. For these reasons, the trial court's judgment is affirmed.

¶60. **COUNT I: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SAID SENTENCE TO RUN CONSECUTIVELY WITH THE SENTENCE IN COUNT II. COUNT II: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS FOR THE REMAINDER OF HIS NATURAL LIFE, AFFIRMED. SAID SENTENCE TO RUN CONSECUTIVELY WITH THE SENTENCE IN COUNT I.**

**SMITH, P.J., COBB, DIAZ, EASLEY AND CARLSON, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. PITTMAN, C.J., AND GRAVES, J., NOT PARTICIPATING.**

1. In selecting the jury for Horne's trial, forty veniremen were considered. Four of the forty veniremen considered were African-Americans. Nine African-Americans were never considered.