# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-KA-02211-SCT

*CARTEZ BRAZZLE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/29/2007 |
| TRIAL JUDGE: | HON. BOBBY BURT DELAUGHTER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JULIE ANN EPPS |
| | E. MICHAEL MARKS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA LYNN BLOUNT |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/23/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1.     Carteze[1] Brazzle was indicted by a Hinds County grand jury on one count of carjacking and one count of kidnapping of Camillia Wright, in violation of Mississippi Code Sections 97-3-117 and 97-3-53, respectively.  Brazzle was found guilty by a jury on both counts following a trial in the Circuit Court for the Second Judicial District of Hinds County. The trial court sentenced Brazzle to consecutive prison sentences of fifteen years for

---

[1] Although the caption of this case spells Brazzle's first name differently, this is how Brazzle spelled it at trial.

carjacking and thirty years for kidnapping. Aggrieved by the judgment, Brazzle appeals to this Court. Finding no error, we affirm.

## FACTS AND PROCEEDINGS BELOW

¶2. Camillia Wright testified that on January 22, 2007, around 11 a.m., she was sitting alone in her red Tahoe in the drive-through line at a Popeye's restaurant located on Highway 80. While ordering lunch, Wright noticed an individual wearing a black coat standing outside the restaurant "fidgeting on his pants like he was about to take a pee." The individual, whom Wright later identified as Carteze Brazzle, walked up to her window, pulled out a gun, and ordered Wright out of the vehicle. When she was unable to exit, Brazzle jumped in, forced her over to the passenger side, and drove the vehicle out of the restaurant's parking lot and onto Highway 80. Wright begged Brazzle to let her go, telling him he could have the Tahoe, but Brazzle refused and threatened to shoot her if she kept looking at him.

¶3. The Tahoe proceeded down Highway 80 toward Highway 220. Upon reaching the on-ramp to Highway 220, Brazzle slowed the vehicle. At that point, Wright opened the door and leapt from the Tahoe. A witness who saw her jump pulled over to assist and provided her with a cell phone which Wright used to call the police.

¶4. Officer Gregory Jackson, who was on routine patrol, saw Wright standing on the side of the road and pulled his cruiser over to inquire what was going on. Wright informed the officer what had happened.

¶5. Moments earlier, Officer Corliss Harris was at a gas station on Highway 80. Officer Harris testified that a motorist drove up and informed him about an incident that had just

2

occurred at Popeye's. Officer Harris stated that he then drove over to Popeye's, where "people inside the restaurant were pointing west on 80." Officer Harris said he then whipped around the parking lot and proceeded down Highway 80. Shortly thereafter, he saw Officer Jackson pulled over on the side of the road at the on ramp to Highway 220, with a black female. Officer Harris said they informed him that the vehicle was a "burgundy SUV," and indicated that it was traveling west on Highway 80.

¶6.     While in "very fast" pursuit, Officer Harris received word over the radio that the vehicle had an Illinois license tag. According to Officer Harris, he then spotted the vehicle as it was heading north on Westhaven, off Highway 80. Officer Harris turned off his blue lights and turned his vehicle onto Westhaven. He caught up with the Tahoe, which at that point was stopped at a railroad crossing due to a passing train. As the train proceeded by, Officer Harris received word that his backup was seconds away, so he reactivated his blue lights in hopes of avoiding a "chase." At that moment, according to Officer Harris, the driver of the vehicle attempted to drive off-road, and in doing so became stuck in a muddy embankment. Officer Harris said the driver then exited the vehicle and ran for a wooded area.

¶7.     Officer Harris stated that when the other officers arrived they "set up a perimeter and went into the woods after him." He testified that the individual was soon located and placed under arrest. According to Officer Harris, a black coat which the individual apparently had tossed also was recovered.

¶8.     Wright was taken to Jackson Police Department headquarters, where she spoke to Officer Reginald Cooper and was asked to participate in a photo lineup. After viewing

3

photographs of a number of individuals, Wright picked one and stated that this was the individual who had carjacked and kidnapped her a few hours before. The individual in the photograph was Carteze Brazzle. In her testimony, Wright stated that she had provided a physical description of the individual and said the individual was wearing a black jacket at the time. Before the jury, Wright identified the defendant, Carteze Brazzle, as the person who both pulled a gun on her and entered her vehicle at Popeye's.

¶9. Brazzle testified in his own defense. He admitted being in the red Tahoe that day, but denied kidnapping or carjacking Wright. According to his testimony, he and his friend Elliott Turner[2] had been riding around in a green Buick[3] which belonged to Turner's girlfriend. The two were driving through west Jackson, when Turner had said, "I believe I know this female right here in this truck right here in front of us. I believe we used to talk in the past." Brazzle, who was lying on the passenger's side "asleep," said he had "looked up, [saw] the truck, and [] laid on back down . . . in the seat and continued to go back to sleep."

¶10. Brazzle said when he awoke, they were in the Popeye's parking lot. Brazzle told the jury, "I was laying there in the car, and [Turner] was, like, 'Say, man.' He bumped me, and he was, like, 'Let me see your coat because it's cold out here.'" Brazzle said he handed his coat to Turner, who then exited the vehicle; and then laid back down to sleep.

---

[2] Officer Cooper stated during cross-examination that, as a part of his investigation, he spoke with a man named Elliot Turner on the telephone; the contents of that discussion are not revealed in the record.

[3] According to Officer Cooper, Officer Harris had noted in his report that he had observed a green Buick following the victim's carjacked vehicle.

¶11. According to Brazzle, he lay there for "about fifteen minutes," waiting on Turner to return, and then went inside Popeye's to look for him. Brazzle said after searching the bathroom stalls, he remembered the "red truck" that Turner said, "he remembered the female that he used to talk to." According to his testimony, Brazzle at that point saw "the truck leaving off Popeye's lot going back towards Ford, Ford Company," on Highway 80. Brazzle said he then got back in the green Buick, and waited for Turner to return. After sitting there for an undisclosed period, Brazzle said he decided to drive the vehicle around the building to look for Turner. When he saw that Turner was not there, Brazzle decided to "check this truck and see [if Turner] was in the truck with the girl before[.]"

¶12. Brazzle testified that he left Popeye's and caught up with the Tahoe, and began "blowing and honking the horn." The vehicle eventually pulled over to the side of the road, and Brazzle asked Turner, "Why did you leave me, man? Why did you leave me up there on the lot like that?" According to Brazzle, Turner's only response was, "Just follow me to my girlfriend's house. I just want to go give her car back." Brazzle said he replied, "All right."

¶13. Brazzle then told the jury, "So we go down the road some, and he pulled over again, and when he pulled over that time, he got out the truck and got to walking towards the car I was in, his girlfriend's car." According to Brazzle, Turner told him, "I don't want my girlfriend to see you in her car because all she going to do is get mad and want to argue." Brazzle responded, "You sure right. I ain't got time to be arguing with nobody else's wife or girlfriend."

¶14.   Brazzle told the jury that as he was standing there talking to Turner, he began "shaking."  According to Brazzle, Turner then said, "You must be cold."  To which Brazzle responded, "Yeah."  Brazzle said that Turner then handed back his coat.  Brazzle stated that Turner got in his girlfriend's vehicle, and that he got in the Tahoe and proceeded to follow Turner down the road.

¶15.   At this point in the testimony, the following exchange occurred between Brazzle and his attorney.

Q.   Okay.  At any time did you see the - - you said he mentioned about a female in the truck earlier?

A.   Yeah.  He said he believed he talked to her.  They had a relationship or whatever.

Q.   When you got in the truck, was there anybody in the truck?

A.   No, sir.

Q.   Now, where did you go once you got in the truck?  Where did y'all go?

A.   When we got in - - see, wasn't no one in the truck when I got in the truck.

Q.   When you got in it - -

A.   - - I followed him - -

Q.   - - in other words, you were in the truck, and where was Elliott?

A.   I was following him.  He was in his girlfriend's car.

¶16.   Brazzle said he followed Turner to the railroad tracks, where the two then stopped for an oncoming train.  While waiting on the train to go through, a police officer pulled up behind Brazzle.  According to Brazzle, the following occurred:

6

And as we're sitting there waiting, the . . . train finally went past, the sticks let up, and when they let up, the train went on by. And when they went on by, the other - - another police coming from the opposite direction flying. So he was flying. He was coming down.

And as I looked at him coming down, I'm thinking he's just fixing to fly on by, but he kind of, like, glanced over there at me like that, and he slammed on brakes, and slid all the way past me, sir.

And he threw the car back in reverse, and when he threw it back in reverse, he jumps out and puts the gun up to the glass of the window. So it startled me, and I kind of pulled my head up and put my hands up and turned off the side of the road just to get away from the barrel of the gun.

So as I pulled off the side of the road, he started running to the truck. So I got out of the truck, and I screamed, "I didn't do nothing. I ain't did nothing." And he kept running toward me with the gun. So I thought he was fixing to try to shoot.

So I stepped on the other side of the truck, and I kind of like I did run off into the woods to take the coat off so I could let them know that I wasn't hiding nothing. So I went to the woods and took the coat off and threw it on the ground, and I come back out of the woods with my hands up.

¶17.  Brazzle's attorney then queried:

Q.     Okay. Let me ask you this now. Why did you run in the woods?

A.     Because I thought they was gonna shoot me, sir, because they was all cocking their guns running out behind me.

Q.     All right. So what made you decide to come out of the woods?

A.     When I got the coat off and let them know that I wasn't hiding nothing, and I had my hands up.

¶18.  After the close of the defense's case-in-chief, Brazzle submitted jury instructions D-9 and D-10, which requested the jury be instructed on the lesser offenses of accessory after the fact and receiving stolen property, respectively.

7

¶19.   The trial court denied both, reasoning:

> And for the record D-9 and D-10 being lesser included and/or lesser related offense instructions, the Court is of the opinion there is simply not an evidentiary basis upon which to give these instructions.
>
> In order to give these instructions the jury would have to be able from the evidence presented to theoretically find the defendant not guilty of the offense charged and to find him guilty of the lesser offense.
>
> . . .
>
> The elements of accessory after the fact are that a completed felony has been committed, that the accused concealed, received, relieved, aided or assisted a felon, knowing that such person had committed a felony, and such assistance or aid was rendered with the intent to enable such felon to escape or avoid arrest, trial, conviction or punishment after the commission of such felony.
>
> And in the case at bar there's simply no evidence . . . presented by the defense through its only witness, the defendant, that he had any knowledge whatsoever that a felony had been committed and that any act upon learning that by him was with the specific intent to aid and assist that person, in this case one Elliott Turner, escaping or avoiding detection or arrest.
>
> Similarly, a statutory element of receiving stolen goods is knowing at the time of receipt of the property that the property had, in fact, been stolen or under circumstances that the defendant reasonably should have known.
>
> And in this case there is just no such evidence presented by the defense. The defense is I didn't do it. Not that I didn't do this, but I may have done that.

¶20.   After which, the following exchange occurred:

By The Court:   Does the defense [wish to be heard concerning any of the Court's preliminary rulings]?

By Defense Counsel:   Just, Your Honor, I feel by submission of D-10, of course I understand the Court's ruling.

By The Court:   Well, tell me what evidence I have concerning guilty knowledge.

By Defense Counsel: I believe, Your Honor, just his statement just as far as his testimony is concerned. That's all.

By The Court: Well, specifically, what did he testify to because I'm missing it. What did he say in his testimony that indicates that he had any clue that this car was even stolen, much less that there was a carjacking?

By Defense Counsel: None that I can recall, Your Honor, and I do understand the Court's ruling.

**Whether the trial judge erred in denying Brazzle's requests for lesser offense instructions on accessory after the fact and/or receiving stolen goods.**

¶21.    Brazzle claims that "denial of either or both of the instructions was fundamental error in violation of his right to a fair trial and due process of law." Brazzle asserts that, without these proposed instructions, he was precluded from presenting his theory of the case to the jury.

¶22.    We disagree.

¶23.    By submitting instructions D-9 and D-10, Brazzle attempted to have the jury charged on accessory after the fact and receiving stolen goods.[4] Preliminarily, it is important to point

---

[4] The crime of accessory after the fact, is set forth in Mississippi Code Section 97-1-5, which states:

> Every person who shall be convicted of having concealed, received, or relieved any felon, or having aided or assisted any felon, knowing that such person had committed a felony, with intent to enable such felon to escape or to avoid arrest, trial, conviction or punishment, after the commission of such felony. . . .

Miss. Code Ann. § 97-1-5 (Rev. 2006).

The crime of receiving stolen property is governed by Section 97-17-70, which states in pertinent part:

out that, although the trial court passingly referred to both as lesser-included offenses and/or lesser-offense instructions, neither offense is a lesser-included offense of either of the two crimes for which Brazzle was indicted. Neither crime contains the essential elements required for the crime of kidnapping or carjacking. *See Porter v. State*, 616 So. 2d 899, 909-10 (Miss. 1993) (Hawkins, J., specially concurring) ("A lesser included offense by definition is one in which all its essential ingredients are contained in the offense for which the accused is indicted, but not all of the essential ingredients of the indicted offense. An accused could not be guilty of the offense for which he is indicted without at the same time being guilty of the lesser-included offense."). Rather, both are entirely separate and distinct offenses. *See Byrom v. State,* 863 So. 2d 836, 874 (Miss. 2003) ("We have repeatedly held that the crime of accessory after the fact is an entirely separate and distinct offense and not a constituent part of a [principal] offense so as to be a lesser included offense.") (quoting *Wilcher v. State,* 455 So. 2d 727, 734 (Miss. 1984), *vacated in part,* 635 So. 2d 789 (Miss.1993)); *see also Williams v. State,* 595 So. 2d 1299, 1303 (Miss. 1992) ("Our law has long held one may not feloniously receive what he has stolen.")

¶24.    That said, this Court has said that a criminal defendant "may request an instruction regarding any offense carrying a lesser punishment if the lesser offense arises out of a

---

(1) A person commits the crime of receiving stolen property if he intentionally possesses, receives, retains or disposes of stolen property knowing that it has been stolen or having reasonable grounds to believe it has been stolen, unless the property is possessed, received, retained or disposed of with intent to restore it to the owner.

Miss. Code Ann. § 97-17-70 (Rev. 2006).

10

nucleus of operative fact common with the factual scenario giving rise to the charge laid in the indictment." *Gangl v. State,* 539 So. 2d 132, 136 (Miss. 1989) (quoting *Griffin v. State,* 533 So. 2d 444, 447-48 (Miss. 1988)). We have held this to mean not only lesser-included offenses but lesser offenses considered separate and distinct from the offense charged in the indictment. *Id.* at 135. The entitlement is limited, however, "in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is *without foundation in the evidence.*" *Poole v. State,* 826 So. 2d 1222, 1230 (Miss. 2002) (citation omitted) (emphasis added).

¶25. As with lesser-included-offense instructions, "lesser offense instructions should not be granted indiscriminately, and only where there is an evidentiary basis in the record." *Gangl*, 539 So. 2d at 136 (citing *Harper v. State,* 478 So. 2d 1017, 1021 (Miss. 1985)). "The evidentiary standard is the same as for lesser included offense instructions[.]" *Id*. (citing *Harper,* 478 So. 2d at 1021).[5] In short, the defendant must point to evidence in the record

---

[5] *Harper* explained:

> The rule on whether a lesser included offense instruction should be given is functionally comparable to that applied when the trial judge considers whether a peremptory instruction or judgment notwithstanding the verdict should be granted[.] The only fact issues which should be taken from the jury are those with respect to which the evidence is so clear that rational jurors could not disagree. On all other material issues of fact, the jury must be instructed in the law so that they may then perform their constitutional responsibility.

> The rule here, however, is the opposite of that which prevails when the defendant requests a peremptory instruction at the conclusion of the state's case. There we say that the evidence must be viewed in the light most favorable to the state and that we must accept as true all evidence supporting conviction even though that evidence may be contradicted by evidence offered

from which a jury reasonably could find the defendant not guilty of the crime with which the defendant is charged and at the same time find the defendant guilty of the lesser offense." *Dampier v. State,* 973 So. 2d 221, 231 (Miss. 2008).

¶26. On appeal, Brazzle concedes that his testimony, if believed in its entirety, established a defense to any claim that he was an accessory after the fact or that he knowingly received stolen property. Brazzle contends, however, that because a jury is entitled to believe or disbelieve witnesses in whole or in part, the jury could infer from the attendant circumstances in this case that there is sufficient evidence to support at least one of the proposed lesser-offense instructions. Specifically, Brazzle contends that, while Wright's identification of Brazzle as the culprit supports an inference Brazzle actually carjacked and kidnapped Wright, the jury also was free to believe that she was mistaken about her identification and find that Brazzle had acquired the vehicle from Turner after the fact, as he claimed.

¶27. This argument fails. For support, Brazzle relies on *Warren v. State,* 709 So. 2d 415 (Miss. 1998), in which this Court reversed a trial court's refusal to grant the defendant's request for a lesser-included-offense instruction on the crime of trespass. There, the

---

by the defendant. We also give the state the benefit of all reasonable favorable inferences which may be drawn from the evidence. Conversely, in the present context, a lesser included offense instruction should be granted unless the trial judge -- and ultimately this Court -- can say, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one essential element of the principal charge).

*Harper*, 478 So. 2d at 1021.

defendant was indicted by a grand jury on the crime of voyeurism, specifically alleging that he "peeped through a window of James' house with a lewd, licentious and indecent purpose."

*Warren* held:

> Warren is guilty of voyeurism only if the jury believed all of what James had to say including her testimony suggesting Warren's lewd purpose for being on her property and looking through her window. Likewise, he is guilty only of trespassing if the jury decided to believe everything that James stated except that portion of her testimony suggesting Warren's lewd purpose. Thus, contrary to the State's contention, there was evidence to support the lesser included instruction on trespassing, and the instruction should have been given.

*Warren*, 709 So. 2d at 420.

¶28.    We find Warren distinguishable. *Warren* was based on the denial of a lesser-included-offense instruction. *Warren*, 709 So. 2d 415. All the "essential ingredients" of the crime of trespass were contained in the offense for which the defendant, Warren, was alleged to have committed. *Porter v. State*, 616 So. 2d at 909-10; *Warren, supra*. Thus, as the *Warren* Court found, if the jury disbelieved Warren's denial that he was ever at James's house, and believed "everything James stated except that portion of her testimony suggesting Warren's lewd purpose[,]" evidence still remained to support the lesser-included-offense of trespass. *Warren,* 709 So. 2d at 420. This is because, based on the attendant facts in its case, in order for the State to prove the alleged crime of voyeurism, it also would have had to prove that Warren had been on James's property without her permission.

¶29.    Here, however, we do not have at issue a lesser-included-offense to the two greater offenses charged in Brazzle's indictment. Rather, as previously mentioned, we have two lesser offenses clearly separate and distinct from those charged, both of which require proof

13

of a crime committed by someone other than the defendant.[6] And, as the trial court found, there is no evidence in the record that Brazzle had any knowledge that either a felony had been committed (one of the elements of accessory after the fact), or that the Tahoe had been stolen (one of the elements of receiving stolen property), by another.

¶30. According to Brazzle's version of the facts, he was with an individual named Turner, in Turner's girlfriend's green Buick, when Turner saw and noticed a woman he knew driving a red Tahoe. Brazzle fell asleep, ended up in Popeye's parking lot, and Turner borrowed his black coat on account of the cold weather. Turner then left the vehicle, and Brazzle went back to sleep. After fifteen minutes passed, Brazzle, acting on his inclination that Turner possibly had left Popeye's in the Tahoe with the woman, drove the green Buick out of Popeye's parking lot, caught up with the Tahoe, and flagged it over to the side of the road. After asking Turner why he had left, Brazzle was told only that he needed to return Turner's girlfriend's car.

¶31. Additional testimony said that Brazzle and Turner thereafter switched vehicles in order to avoid a girlfriend's wrath, and that Brazzle's black coat was returned to him. The testimony shows that, while Brazzle and Turner were stopped at railroad crossing waiting for a train to pass, a police vehicle pulled in behind Brazzle. When the train finally passed and

---

[6] It should be noted that *Gangl,* which opened the door to permitting instructions based on a lesser offense separate and distinct from the offense charged in an indictment, involved the lesser offense of accessory after the fact and the greater offense of accessory before the fact. *Gangl,* 539 So. 2d at 135. The *Gangl* Court made it a point to note that no evidence was presented showing that the defendant was a participant in the robbery at issue in that case. *See id.* ("It is important to note here that no evidence, direct or circumstantial, implicated Gangl as a primary participant in the armed robbery").

14

"the sticks let up," another police vehicle, which Brazzle described as "flying," approached from the opposite direction. Brazzle's thinking at this moment, according to his testimony, was that the police vehicle was "just fixing to fly on by." When–as the testimony indicated–it did not, Brazzle pondered why. Brazzle explained that, when a police officer emerged from the vehicle and placed his gun up to the glass of the window, Brazzle became "startled." So he "turned off the side of the road just to get away from the barrel of the gun." According to his testimony, Brazzle got out of his vehicle screaming, "I didn't do nothing." When the officer kept approaching, Brazzle "thought he was fixing to try to shoot." So he stepped on the other side of the truck, . . . [ran] off into the woods to take the coat off so [he] could let them know that [he] wasn't hiding nothing."

¶32. By contrast, the State presented evidence through Wright's testimony that, while at the Popeye's drive-through, Brazzle, by show of a gun, entered her vehicle and absconded with both it and Wright from the restaurant's parking lot. Wright soon escaped, called the police, and thereafter identified Brazzle as the culprit from a photo lineup. She identified Brazzle again at trial.

¶33. The State presented additional evidence that, before word went out over radio from police dispatch, Officer Harris had been informed of the incident by a motorist. Harris eventually caught up with the Tahoe and flashed his emergency blue lights. Accordingly, the driver of the vehicle attempted to flee off-road before becoming stuck. The driver of the vehicle, later identified by Officer Harris as Brazzle, then ran into the woods before being apprehended.

15

¶34. With *Harper* in mind, when taking the evidence in the light most favorable to the Brazzle, and considering all reasonable favorable inferences which may be drawn in favor of Brazzle from the evidence, we find that no reasonable jury could find Brazzle guilty of either accessory after the fact or receiving stolen property without resorting to speculation or conjecture. *Harper*, 478 So. 2d at 1021. Based on our review of the record, there simply is no evidentiary basis to support the requisite knowledge element for either lesser-offense instruction. *See* Miss. Code Ann. §§ 97-17-70 and 97-1-5 (Rev. 2006).

¶35. Despite the dissent's somersault logic to the contrary, any evidentiary question, such as whether or not another individual by the name of Turner actually was involved in the case; or whether or not a green Buick was in the area; or any inconsistencies between Officer Harris's version and Brazzle's as to what occurred at the railroad crossing, all were factual issues for the jury to resolve on the question of Brazzle's guilt or innocence of the two crimes for which he was indicted. The dissent's assertion that "the majority sets a dangerous precedent and deals a substantial blow to the rights of criminal defendants in this state" is absurd.

¶36. The State's evidence, along with Brazzle's version of events, was submitted to the jury for its assessment in deciding how much, if any, weight and credibility it was willing to place with each. Any reasonable doubt as to the State's proof of Brazzle's role in these two crimes entitled Brazzle to nothing short of an absolute discharge.

**CONCLUSION**

¶37. The judgment and sentences of the Circuit Court for the Second Judicial District of Hinds County are affirmed.

16

¶38. **COUNT I: CONVICTION OF CARJACKING AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF KIDNAPPING AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNTS I AND II TO RUN CONSECUTIVELY.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, LAMAR AND CHANDLER, JJ., CONCUR. GRAVES, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.**

**GRAVES, PRESIDING JUSTICE, DISSENTING:**

¶39. Carteze Brazzle was convicted of one count of carjacking and one count of kidnapping after a jury trial in Hinds County Circuit Court. The trial court sentenced him to consecutive prison sentences of fifteen years for carjacking and thirty years for kidnapping. By affirming Brazzle's conviction despite the trial court's failure to properly instruct the jury, the majority misapplies the relevant principles of law and greatly impairs the rights of criminal defendants in Mississippi. Therefore, I respectfully dissent.

**I.**

¶40. Brazzle's conviction arises out of a series of events that occurred on January 22, 2007. The facts are disputed. During the trial, the jury heard testimony from the victim, three police officers, and Brazzle.

*Camillia Wright's Testimony*

¶41. Wright testified that, on January 22, 2007, around 11 a.m., she was at a Popeye's restaurant on Highway 80 in Jackson, Mississippi. She stated that she was in the "drive-thru" lane and observed a man outside the restaurant. According to Wright, as she was about to pay for her food, this man approached the driver's side window of her car, pulled out a gun,

17

and told her to get out of her car. Wright testified that she was driving a red Tahoe. She stated that the man then pushed her over to the passenger side and got into her car. She also stated that she asked to get out of the car, but the man would not let her and drove onto Highway 80. Wright claimed that she was able to observe the man's face before he threatened to shoot her if she continued to look at him. Wright stated that the man let her jump out of the car near the ramp to Highway 220. According to her testimony, a man who had witnessed her jumping out of the car pulled over and allowed her to use his cell phone to call the police. Wright also testified that a police officer, who was passing by on patrol, stopped to assist her.

¶42.   Wright stated that, after she had been taken to the police station, she gave the police the following description of the man who stole the car: five-foot-six, short, chubby, dark-skinned, with nappy hair, and wearing a black jacket. She also stated that she was asked to view a photographic lineup and that she identified Brazzle as the man who stole the car.

*Officer Gregory Jackson's Testimony*

¶43.   Officer Jackson testified that on January 22, 2007, he was on patrol driving down Highway 80 when he observed Wright at the I-220 ramp. He testified that he pulled over, that Wright told him her car had been stolen, and that she gave him a description of the car (a red Tahoe) and told him the direction in which the man had driven. He also stated that Wright told him that the man was a black male, short, and wearing a black jacket. Officer Jackson testified that he drove with Wright to assist other officers who were setting up a perimeter to apprehend the man. According to Officer Jackson, he recovered a jacket from the scene and then took Wright to the police station.

18

*Officer Corliss Harris' Testimony*

¶44.   Officer Harris testified that he was on patrol in the vicinity of the Popeye's restaurant when he was informed of an incident at Popeye's involving a burgundy Tahoe. Officer Harris stated that he proceeded to the restaurant, where unidentified individuals told him that the car was heading west on Highway 80. He testified that he saw a burgundy Tahoe and eventually caught up with it. He stated that he turned his lights off so that he would not "spook" the driver of the Tahoe until backup officers had arrived. Officer Harris testified that he and the driver of the Tahoe were stopped at a railroad crossing and that, when the train had almost passed, he learned that backup officers were seconds away, so he turned his lights back on to prevent a car chase. According to Officer Harris, once he turned his lights back on, the driver of the Tahoe attempted to drive off the road, but the car became stuck in the muddy embankment. Officer Harris testified that the driver then got out of the car and ran toward the nearby woods. Officer Harris also stated that Officer Jackson recovered a black jacket from the woods.

*Officer Reginald Cooper's Testimony*

¶45.   Officer Cooper testified that, on January 22, 2007, he spoke with Wright. He stated that Wright told him that the man who stole her car was five-foot-six or five-foot-seven, dark-skinned, chubby, and had nappy hair. He also testified that he showed Wright a photographic lineup. According to Officer Cooper, he also interviewed Brazzle, who gave two statements. Officer Cooper testified that he had possession of a black jacket, which Brazzle admitted belonged to him.

19

¶46. Officer Cooper stated that, as a part of his investigation, he spoke with a man named Elliott Turner on the telephone, although the contents of that discussion are not revealed in the record. Officer Cooper also admitted that Officer Harris had observed a green Buick following the Tahoe before the driver of the Tahoe was apprehended, and that the presence of this vehicle had been noted in the police report.

*Carteze Brazzle's Testimony*

¶47. Brazzle testified that, on January 22, 2007, his friend Elliott Turner asked him to accompany him to pick up some car rims. Brazzle stated that Turner was driving Turner's girlfriend's green Buick. On the way to get the rims, Brazzle testified that Turner said that he knew the woman in the maroon Tahoe in front of them. Brazzle stated that he did not pay much attention because he was dozing in the passenger seat. Brazzle testified that when he woke up, he found that they were in a Popeye's parking lot. He stated that Turner asked to borrow Brazzle's coat, which he gave to him. Brazzle testified that he fell asleep again in the car and that when he woke up, Turner was gone. Brazzle stated that he waited for a while in the car and then went to look for Turner inside Popeye's. He testified that he saw a car leaving the Popeye's parking lot, which he recognized as the maroon Tahoe to which Turner had earlier referred. Brazzle testified that he waited a little longer and then followed the car.

¶48. He stated that he was eventually able to catch up with the maroon Tahoe. He said that Turner pulled over in the Tahoe, told Brazzle that he needed to return the green Buick to his girlfriend's house, and asked Brazzle to drive the Tahoe instead of the Buick. Brazzle stated that Turner did not want his girlfriend to see Brazzle driving her car. Brazzle testified that, at this point, Turner also returned his black coat to him. Brazzle stated that he got into the

20

Tahoe, which was empty except for him, and started following Turner in the green Buick. Brazzle testified that they were stopped at a railroad crossing when police officers suddenly pulled up. He stated that, when one of the police officers came up to the driver's side window and pointed a gun in his face, he panicked and turned the car off the side of the road. He testified that the police officer was running in his direction with the gun pointed at him, so he got out of the Tahoe, ran to the woods, and removed his coat so that the police would not think he was hiding anything. He testified that Turner was still in the green Buick by the railroad crossing when he was arrested.

## II.

¶49. On appeal, Brazzle argues that the trial court committed reversible error by refusing to instruct the jury on the lesser offenses of accessory after the fact and receiving stolen property. He argues that these instructions are supported by the evidence and emphasizes that the jury could have believed or disbelieved some or all of the evidence presented. This is an accurate reading and an appropriate application of the relevant legal principles. Therefore, I agree.

¶50. As the majority correctly recognizes, this Court has held that "jury instructions are not given unless there is an evidentiary basis in the record for such." *Fairchild v. State*, 459 So. 2d 793, 800 (Miss. 1984) (citations omitted); *see also Gangl v. State*, 539 So. 2d 132, 136 (Miss. 1989) (citations omitted); Maj. Op. ¶ 25. In other words, the jury instructions must be based on more than pure speculation. *Fairchild*, 459 So. 2d at 801 (citations omitted).

¶51. Nevertheless, the evidence must be viewed in the light most favorable to the defendant. *See, e.g.*, *Fairchild*, 459 So. 2d at 801 (citation omitted); *Lee v. State*, 469 So.

21

2d 1225, 1230 (Miss. 1985) ("[T]he defendant must be given the benefit of all doubts about the evidence."). Furthermore, all favorable inferences must be drawn in favor of the defendant. *See, e.g.*, **Jones v. State**, 798 So. 2d 1241, 1254 (Miss. 2001) (citation omitted); **Welch v. State**, 566 So. 2d 680, 684 (Miss. 1990); **Fairchild**, 459 So. 2d at 801. The majority acknowledges this by quoting this Court's decision in **Harper v. State**, 478 So. 2d 1017, 1021 (Miss. 1985), in a footnote. Maj. Op. ¶ 25.

¶52. The majority rightly states that the defendant "may request an instruction regarding any offense carrying a lesser punishment if the lesser offense arises out of a nucleus of operative fact common with the factual scenario giving rise to the charge laid in the indictment." **Gangl**, 539 So. 2d at 136 (citation omitted); *see also* **Mease v. State**, 539 So. 2d 1324, 1329 (Miss. 1989) (citation omitted); Maj. Op. ¶ 24. The majority also correctly notes that the evidentiary standard for lesser-offense instructions and lesser-included-offense instructions is the same. *See, e.g.*, **Gangl**, 539 So. 2d at 136 (citation omitted); Maj. Op. ¶ 25.

¶53. However, the majority fails to mention that, even if there is sufficient evidence supporting the conviction on the principal charge, it may still constitute reversible error for the trial court to have refused the lesser-included-offense instruction. **Fairchild**, 459 So. 2d at 800-01 (citation omitted); *see also* **Taylor v. State**, 577 So. 2d 381, 383 (Miss. 1991) (citations omitted); **Mease**, 539 So. 2d at 1330 (citation omitted). Moreover, the majority fails to comprehend that this Court "do[es] not ask which way the evidence preponderates." **Fairchild**, 459 So. 2d at 800; *see also* **Taylor**, 577 So. 2d at 383 (citation omitted). This Court has emphatically stated that "only where the evidence could *only* justify a conviction

22

of the principal charge should a lesser included offense instruction be refused." ***Fairchild***, 459 So. 2d at 800; *see also **Taylor***, 577 So. 2d at 383 (citations omitted). This Court has also held that "[a] lesser-included offense instruction *must be granted* where *a reasonable juror could not on the evidence exclude the lesser-included offense beyond a reasonable doubt*." ***Jones***, 798 So. 2d at 1253 (citation omitted) (second emphasis added); *see also **Welch***, 566 So. 2d at 684 (citation omitted). Accordingly, this Court has made clear that "[t]he granting of instructions should err on the side of inclusion rather than exclusion." ***Jones***, 798 So. 2d at 1254 (citation omitted).

¶54. The majority also appears oblivious of the fact that, when reviewing the record for evidentiary support for lesser-offense instructions, this Court applies the basic and fundamental principle that the jury may consider any of the evidence presented at trial. *See, e.g.*, ***Taylor***, 577 So. 2d at 384. Furthermore, the jury can believe or disbelieve some or all of the testimony. ***Warren v. State***, 709 So. 2d 415, 420 (Miss. 1998) (citations omitted); ***Taylor***, 577 So. 2d at 384 (citation omitted). This Court has stated that the fact that the jury did not believe the defendant's testimony is *irrelevant* when determining whether a lesser-included-offense instruction should have been given. ***Lee***, 469 So. 2d at 1231.

¶55. Taking the evidence in the light most favorable to Brazzle, the record reflects that there was an evidentiary basis for the lesser-offense instructions he requested – contrary to the conclusion reached by the majority. *See **Fairchild***, 459 So. 2d at 801 (citations omitted); ***Lee***, 469 So. 2d at 1230 (citations omitted). The elements of accessory after the fact are: 1) concealing, receiving, relieving, aiding, or assisting a felon; 2) with the knowledge that such person had committed a felony; and 3) with the intent to enable the felon to escape or avoid

arrest, trial, conviction, or punishment after the commission of the felony. Miss. Code Ann. § 97-1-5 (Rev. 2006); *Gangl*, 539 So. 2d at 136. The evidence presented in this case could have supported a jury's reasonable finding that Brazzle knowingly aided or assisted a felon with the intent to help the felon escape or avoid arrest, trial, conviction, or punishment.

¶56. Brazzle testified concerning Turner's role in the events of January 22, 2007, and stated that Turner spotted a woman he knew driving the red Tahoe, that Brazzle fell asleep and ended up in a Popeye's parking lot, and that Turner borrowed his jacket and left him in the car. Brazzle also testified that, after looking for Turner inside Popeye's, he saw the red Tahoe leaving the parking lot and eventually decided to follow it. He testified that, when Turner finally pulled over, the woman was no longer in the Tahoe and that Turner asked Brazzle to drive it to Turner's girlfriend's house. Additional circumstantial evidence in support of Turner's involvement was provided by Officer Cooper, who testified that, as a part of his investigation, he spoke with a man named Elliott Turner on the telephone, although the contents of that discussion are not revealed in the record. He also admitted that Officer Harris had observed a green Buick following the Tahoe before the driver of the Tahoe was apprehended, and that the presence of this vehicle had been noted in the police report. Brazzle testified that Turner had been driving a green Buick that day.

¶57. Officer Harris testified that Brazzle was the individual driving the red Tahoe. In addition, Officer Cooper testified that Brazzle had admitted that he had been in the Tahoe. The prosecution also presented evidence suggesting that Brazzle knew that the Tahoe he was driving had been stolen. According to Officer Harris, once he turned his lights on, the driver of the Tahoe (later identified as Brazzle) attempted to drive off the road, although the car

24

became stuck in the muddy embankment. He then testified that the driver got out of the car and ran toward the nearby woods. "[I]t is a well-established principle that flight is admissible as evidence of consciousness of guilt," subject to Mississippi Rule of Evidence 403. *Fuselier v. State*, 702 So. 2d 388, 390 (Miss. 1997) (citation omitted); *see also Shaw v. State*, 915 So. 2d 442, 447 (Miss. 2005) (citations omitted). This testimony clearly could support a jury's reasonable finding that Brazzle knew the Tahoe had been stolen, thus satisfying the knowledge requirement for both accessory after the fact and receiving stolen property, which will be discussed below. As stated above, the law only requires that there be an evidentiary basis for the instructions requested. *See, e.g.*, *Fairchild*, 459 So. 2d at 800 (citations omitted). The law does not state that the evidentiary basis for the instructions requested must be provided *by the party requesting the instructions*. Thus, the fact that Brazzle maintained that he had no knowledge of Turner committing a felony is completely irrelevant to the determination of whether a lesser-offense instruction for accessory after the fact should be given, since there is testimony suggesting otherwise.

¶58. Based on all this testimony, a jury could have reasonably concluded that Turner had committed a felony by stealing the Tahoe and driving it away from Popeye's and that Brazzle had knowledge of this, despite his claim that he was unaware. A jury could have reasonably found that, by agreeing to switch cars with Turner and by attempting to evade the police, Brazzle knowingly aided or assisted a felon with the intent to help the felon escape or avoid arrest, trial, conviction, or punishment. Thus, a jury could reasonably find that Brazzle was guilty of accessory after the fact, but not guilty of carjacking or kidnapping. The lesser-offense instruction for accessory after the fact should have been given.

25

¶59. The elements of receiving stolen property are: 1) intentionally possessing, receiving, retaining, or disposing of stolen property; 2) with the knowledge or having reasonable grounds to believe that the property had been stolen. Miss. Code Ann. § 97-17-70 (Rev. 2006). Based on the evidence reviewed above, a jury also could have reasonably found Brazzle guilty of receiving stolen property, but not guilty of carjacking and kidnapping. Officer Harris' testimony established that Brazzle was driving the Tahoe and that he attempted to drive it through the embankment. Officer Cooper testified that Brazzle admitted to being in the Tahoe. The fact that Brazzle was driving the Tahoe, which had been taken from Wright, would clearly demonstrate intentional possession of stolen property. And again, a jury could find incredible Brazzle's explanation for how he ended up driving the Tahoe and reasonably conclude, based on the prosecution's evidence, that, while Brazzle did not carjack or kidnap Wright, he did have actual knowledge or a reasonable belief that the Tahoe had been stolen. Thus, the lesser-offense instruction for receiving stolen property also should have been given.

¶60. In other words, if the jury – as it is entitled to do – believed Brazzle's testimony concerning Turner and all of the State's evidence, except for Wright's identification of Brazzle, then Brazzle would only be guilty of accessory after the fact and receiving stolen property. This Court made a similar point in *Warren v. State* and concluded that the trial court committed reversible error by refusing to instruct the jury on a lesser-included offense. *Warren*, 709 So. 2d at 420. In *Warren*, the defendant was indicted for voyeurism for allegedly peeping through the window of the victim's house and harassing and threatening her and her children for two hours late one evening. *Id.* at 417. The victim testified that

26

Warren told her to "go into her bedroom, pull back her curtains, take off her clothes, and 'get off on herself.'" *Id.* Warren testified that he had never been to the victim's house and that he had never harassed or threatened her for lewd or licentious purposes. *Id.* at 418.

¶61.　Warren requested a jury instruction for trespassing, which the trial court denied. *Id.* at 418. On appeal, the State made an argument very similar to the one it makes in this case and maintained that "there was no basis in the record for Warren to have claimed that he was merely guilty of trespassing in light of Warren's claim that he was not even on the victim's property." *Id.* at 420. This Court stated:

> Contrary to the State's position, we conclude that it was reversible error to reject Warren's request for a lesser included instruction on trespassing. Our law is that *the burden of proof is upon the State to prove each element of the crime. . . . If it fails in so doing, the defendant is entitled to an acquittal on the offense charged even if the elements proven constitute guilt of a lesser offense. . . . A jury is entitled to believe or disbelieve witnesses in whole or in part.*

*Id.* at 420 (citations omitted) (emphasis added). This Court concluded in *Warren* that

> Warren is guilty of voyeurism only if the jury believed all of what James [i.e., the victim] had to say including her testimony suggesting Warren's lewd purpose for being on her property and looking through her window. Likewise, he is guilty only of trespassing if the jury decided to believe everything that James stated except that portion of her testimony suggesting Warren's lewd purpose. Thus, contrary to the State's contention, there was evidence to support the lesser included instruction on trespassing, and the instruction should have been given.

*Id.*

¶62.　As stated above, this Court has held that "only where the evidence could *only* justify a conviction of the principal charge should a lesser included offense instruction be refused." *Fairchild*, 459 So. 2d at 800; *see also Taylor*, 577 So. 2d at 383 (citations omitted). Viewing the evidence presented at trial in the light most favorable to Brazzle, drawing all reasonable

27

inferences in favor of Brazzle, and applying the legal framework constructed by this Court for reviewing requests for lesser-offense instructions, the jury instructions for accessory after the fact and receiving stolen property should have been given in this case.

¶63.   Despite the precedent set in *Warren* and despite the applicable legal framework, the majority concludes that the trial court properly refused both instructions. The majority states:

> Brazzle contends, however, that because a jury is entitled to believe or disbelieve witnesses in whole or in part, the jury could infer from the attendant circumstances in this case that there is sufficient evidence to support at least one of the proposed lesser-offense instructions. Specifically, Brazzle contends that, while Wright's identification of Brazzle as the culprit supports an inference Brazzle actually carjacked and kidnapped Wright, the jury also was free to believe that she was mistaken about her identification and find that Brazzle had acquired the vehicle from Turner after the fact, as he claimed.
>      This argument fails.

Maj. Op. ¶¶ 26-27. The majority then proceeds to discuss *Warren*, but never clearly sets out its reasoning for reaching the conclusion that Brazzle's argument fails. The majority fails to explain why it is that the jury was *not* free to believe that Wright "was mistaken about her identification" of Brazzle and why the jury was also *not* free to believe that "Brazzle had acquired the vehicle from Turner after the fact, as he claimed." Maj. Op. ¶ 26.

¶64.   Presumably, the majority reaches its conclusion because it finds that there was no evidentiary basis for the lesser-offense instructions – though it does not explicitly state this. The majority appears to be of the inflexible and misguided opinion that the evidence presented at trial could only lead the jury, as the factfinder, to one of two conclusions – either 1) that Brazzle is guilty of carjacking and kidnapping or 2) that Brazzle is not guilty of carjacking and kidnapping and also not guilty of accessory after the fact and receiving stolen property. *See* Maj. Op. ¶ 36. However, it has long been held that the jury sits as the

28

factfinder in criminal trials, and it is well-established that the jury may consider any of the evidence presented and may believe or disbelieve some or all of the testimony. *See, e.g.*, *Groseclose v. State*, 440 So. 2d 297, 300-01 (Miss. 1983) (citation omitted); *Taylor*, 577 So. 2d at 384 (citation omitted). Furthermore, this Court has also explicitly stated that the fact that a particular jury did not believe the defendant's testimony is irrelevant when determining whether a lesser-included-offense instruction should have been given. *Lee*, 469 So. 2d at 1231; *but see* Maj. Op. ¶ 36. As stated above, a jury could have reasonably found Brazzle guilty of accessory after the fact and receiving stolen property (and not guilty of carjacking and kidnapping) based on the evidence presented at trial.

¶65. The majority declares that *Warren* is distinguishable merely because, according to the majority, the analysis in *Warren* only applies to lesser-included-offense instructions. However, the majority ignores the fact that the evidentiary standard for lesser-offense instructions and lesser-included-offense instructions is the same. *See, e.g.*, *Gangl*, 539 So. 2d at 136 (citation omitted). When deciding whether a lesser-included-offense instruction or a lesser-offense instruction should be given, a trial court asks the same question: whether there is an evidentiary basis in the record to support the instruction. *See, e.g.*, *Fairchild*, 459 So. 2d at 800 (citations omitted); *Gangl*, 539 So. 2d at 136 (citation omitted). Since the same standard applies for giving lesser-included-offense instructions and lesser-offense instructions, and the same standard applies for reviewing trial courts' decisions regarding lesser-included-offense instructions and lesser-offense instructions, the majority's only ground for distinguishing *Warren* clearly has no basis in the law or in logic. Furthermore, although the majority claims that there is no evidence that Brazzle knew that a felony had

29

been committed or that the Tahoe had been stolen, the evidence presented at trial, as discussed in detail above, clearly could have supported a jury's reasonable finding that Brazzle did have knowledge of a felony and that the Tahoe had been stolen. Maj. Op. ¶ 29.

¶66. In closing, the majority states that "[a]ny reasonable doubt as to the State's proof of Brazzle's role in the two crimes for which he was indicted entitled Brazzle to nothing short of an absolute discharge." Maj. Op. ¶ 36. It is true that, if the prosecution failed to prove beyond a reasonable doubt that Brazzle was guilty of carjacking and kidnapping, then the jury is duty-bound to find Brazzle not guilty of carjacking and kidnapping. However, this does not mean that the lesser-offense instructions requested by Brazzle were properly refused by the trial court. Brazzle was entitled by law, based on the testimony presented at trial, to the lesser-offense instructions that he requested. The jury should have been instructed on these lesser offenses, which, I note, would have done nothing to preclude the jury from acquitting Brazzle, in an "absolute discharge," if it found that the prosecution did not meet its burden of proof. *See* Maj. Op. ¶ 36.

¶67. The trial court erred in denying Brazzle's requests for the jury to be instructed on both accessory after the fact and receiving stolen property because, based on all the evidence presented, a jury could have reasonably found him guilty of the lesser offenses and not of carjacking and kidnapping. *See, e.g.*, ***Jones***, 798 So. 2d at 1253 (citation omitted); ***Welch***, 566 So. 2d 684 (citation omitted). Today, the majority of this Court misconstrues and misapplies the relevant principles of law. In so doing, the majority sets a dangerous precedent and deals a substantial blow to the rights of criminal defendants in this state. Therefore, I respectfully dissent.

**KITCHENS, J., JOINS THIS OPINION.**